STATE OF NORTH CAROLINA v. ELDRIDGE FRANK WOLFE

No. COA02-388

(Filed 1 April 2003)

**1. Criminal Law— competence to stand trial—hearing—notice**

Defendant received reasonable notice of a hearing on his capacity to stand trial where defense counsel raised the issue of a hearing on the first day of trial by stating that he had never received a report from defendant's competency examination, the trial court found the report in the case file and allowed both defendant and the State to review and copy the report, and the court proceeded with the competency hearing over defendant's assertion that he needed more time. N.C.G.S. § 15A-1002 (2002).

**2. Criminal Law— continuance denied—defendant's competence questioned**

There was no error in a first-degree murder prosecution where the trial court denied defendant's motion to continue after defense counsel questioned defendant's competency to proceed during jury selection. The ruling on the motion to continue was not the source of any prejudice to defendant; moreover, the court granted a week's recess for treatment of defendant after an evaluation by a doctor.

**3. Criminal Law— competence to stand trial—jurors selected before competence questioned**

There was no plain error in the trial court's failing to strike ex mero motu four jurors selected the day before defense counsel questioned defendant's competency. Defendant did not move to strike jurors at trial and it is not clear that defendant was not competent on that date.

**4. Criminal Law— competence to stand trial—supporting evidence**

A trial court finding of defendant's competence to stand trial was supported by medical testimony.

**5. Criminal Law— self-defense—instruction denied**

The trial court did not err by denying a request for a self-defense instruction in a murder prosecution where the evidence

was insufficient to raise the issue of whether defendant reasonably believed he had to shoot to protect himself from death or great bodily harm.

**6. Sentencing— habitual felon—indictment—prima facie case—prior judgments—discrepancy in race of defendant**

The State met the statutory prima facie requirement for submitting an habitual felon case to the jury where the State submitted certified records of judgments entered upon felony convictions of a person bearing defendant's name, but defendant is white while the convicted person's race in one of the indictments is noted as black. Discrepancies in details are for the jury to consider.

**7. Sentencing— habitual felon—instructions—identity of defendant**

The trial court did not err in an habitual felon prosecution by denying defendant's request for an instruction that the jury must find beyond a reasonable doubt that defendant is the person named in the prior judgments. The references to the name in the instructions given could only have been understood as referring to defendant.

**8. Sentencing— habitual felon—prior offense upgraded**

The trial court did not err by not dismissing an habitual felon charge where defendant contended that a 1987 voluntary manslaughter conviction was a Class F felony in 1987 rather than the Class D felony it would have been at this trial. Voluntary manslaughter is a superseded offense which the State was specifically authorized to use by N.C.G.S. § 14-7.7.

**9. Constitutional Law— ex post facto—habitual felon sentence enhancement**

The use of a voluntary manslaughter judgment from 1987 to support an habitual felon indictment did not violate constitutional ex post facto provisions because defendant's habitual felon status only enhances his punishment in the present case, not his punishment for the underlying voluntary manslaughter.

**10. Constitutional Law— ex post facto—habitual felon statute**

The violent habitual felon statute, N.C.G.S. § 14-7.7, is not an ex post facto law in that it was passed in 1994 but allows the use of felony judgments from 1967. An habitual felon statute enacted

in 1967 put perpetrators on notice that certain crimes could be used to enhance punishment for later crimes.

Appeal by defendant from judgment entered 27 October 2000 by Judge A. Leon Stanback in Wake County Superior Court. Heard in the Court of Appeals 22 January 2003.

*Attorney General Roy Cooper, by Special Deputy Attorney General Ronald M. Marquette, for the State.*

*Miles & Montgomery, by Lisa Miles, for defendant-appellant.*

MARTIN, Judge.

Defendant was indicted for the first degree murder of Paul Solis and for being a violent habitual felon. He appeals from a judgment sentencing him to life imprisonment without parole entered upon jury verdicts finding him guilty of second degree murder and being a violent habitual felon.

The evidence presented at trial indicates that at about 10:30 or 11:00 p.m. on 3 August 1999 Paul Solis was shot and killed by defendant in the back parking lot of the Korner Pocket, a pool hall in Raleigh, N.C. Testimony by various witnesses indicated that defendant and Solis were friends prior to 3 August.

Defendant's wife, Patti Wolfe, testified that she and defendant and their 13-year-old son, Jacob, went to the Korner Pocket sometime before sundown on 3 August. She stated that she talked to Solis to ask if something had happened between him and defendant the night before, but Solis said everything was all right. While there, Tami Muse, whom Patti knew to be defendant's "friend," came in and sat at the bar. Because defendant had brought Muse over to their house earlier that day while Patti was at home, Patti was very upset that Muse was at the bar. Patti stated that Muse and defendant went outside separately several times, but obviously to talk together. Because Patti was angry, she talked and danced with others. Defendant, whom Patti described as "very jealous," became angry with her and said they had to leave.

Patti testified that she, defendant and Jacob left via the front door of the bar and that Jacob pulled defendant some feet away to say that he wanted them to be like a family. Patti saw defendant rest his gun on the bumper of a nearby truck and heard him say to Jacob that Patti was "going to die tonight. She's drunk and she doesn't know

what she's doing and she's going to have to die." The three then continued around the side of the building to the back lot where they had parked Patti's truck. Patti testified that defendant was calling her names and pushing and tripping her. She stated that as they came around the back corner of the building, she saw Solis in the back doorway, but they did not exchange greetings. When they got to the truck, Jacob suddenly ran away back around the building. Because she was scared, Patti followed him into the bar and hid. She stated that by the time she got to the front corner of the building, she heard a gunshot. She further testified that defendant had taken cocaine that day and had been doing drugs for a day or so, that they had been drinking since the afternoon, and she described defendant as "out of control" that night. Patti also stated that defendant always carried a gun with him.

Judy Billings, Solis' girlfriend of a few months, testified that when she arrived at the bar, defendant and his family were there, as were Muse and Billings' brother and father. She testified that the situation was "very tense" because both Patti and Muse were in the bar. She did not think there was tension between defendant and Solis. Billings stated that at some point Solis went out back to take a call on his cell phone. She testified that she knew defendant always carried a gun, but that Solis never did. According to Billings, Solis was strongly opposed to violence against women and had indicated that he would intervene if he knew a man had abused or was abusing a woman.

Hosey Harrington, Jr., Billings' brother, testified that he noticed no tension between defendant and Solis on 3 August, but did see defendant and Patti arguing at the bar. When he went outside to use an outside staircase to meet one of the bartenders upstairs, Harrington stated that he saw defendant, Patti, and Jacob come around the side of the building and heard defendant say, "You f——— b——, I'll kill you," and saw Patti fall to the ground. Only a minute or so after he got to the upstairs room, Harrington heard mumbling and then a gunshot. He then looked out the window and saw defendant holding a gun in the air by his truck and shouting, "Woo, woo, woo." After defendant drove away, Harrington and the bartender, Barry Seville, went downstairs and found Solis lying on the ground with a gunshot wound to the head. Although Barry Seville was not available to testify at trial due to an accident, Detective Eugene Woodlief, a witness for the defense, testified at trial to the statement he took from Seville on 9 August 1999. Although Seville's statement corresponded for the most part with Harrington's, his version indicated that after he

and Harrington heard the gunshot and he looked down through a window to the back lot, he saw defendant walk to his truck and drive away quickly. Seville indicated in the statement that he did not see anything in defendant's hands.

Jennifer Spence, a part-time bartender at the Korner Pocket and girlfriend of defendant's brother, Robert Wolfe, testified that she was tending bar on 3 August when defendant, his family, Muse, and Solis were in the bar. She testified that the atmosphere was "awkward" because Patti and Muse were both at the bar, but that there was no tension between defendant and Solis. She stated that defendant, Patti, and Solis had drunk enough that she was going to quit serving them alcohol. Spence also testified that she had been with defendant when he had experienced hallucinations, and that she had heard him howl like a wolf when he was happy.

Robert Wolfe, defendant's brother, testified that he and the victim had been friends for about two or three years and that on the night in question the victim invited him to have a beer with him at the Korner Pocket. When defendant arrived, he asked his brother to step outside a few times and talked about being upset with the victim due to a wrestling incident between them the night before. Wolfe testified that defendant told him "he wanted to knock [the victim] out pretty much." He noticed that defendant had a gun on him that night and that he was in a "strange" mood and "just talking crazy stuff." Wolfe testified that soon after defendant and Patti and Jacob left the bar, Jacob came running back in and told him "to call 911 because [defendant] was going to kill everybody at the bar." After hiding Jacob, Wolfe went to look for defendant and saw the victim laying on the ground in the back lot. Wolfe stated that he saw defendant driving away in the truck as he came out the back door and first saw the victim on the ground. Wolfe also stated that he saw no weapon on or around the victim. He stated that defendant paged him the next evening and he told defendant to turn himself in. During their call, defendant said to his brother, "I had to pop him before he popped me."

Tami Muse testified that she had become defendant's girlfriend in June 1999. She stated that on the evening of 3 August, there was tension due to her presence, and Patti's, at the Korner Pocket. She eventually left the bar because she did not feel well. She next heard from defendant before midnight and he asked her to pick him up at The Doll House. When she arrived, she saw defendant get out of a

STATE v. WOLFE

[157 N.C. App. 22 (2003)]

van driven by his mother, hug his brother Mike, and say, "It will be all right." The next morning they drove to Fayetteville and stayed with a friend of defendant's. In Fayetteville, Muse testified, defendant cried and told her that he had killed Solis on 3 August. Defendant told her that the gun had been pulled and they fought over it and it went off. After four or five days, they drove to Wilmington to stay with a friend. There she heard defendant say that he had "taken somebody out."

Michael Venable, who had grown up with defendant and Robert Wolfe and lives in Wilmington, testified that he received a call from defendant after 3 August asking Venable to meet him nearby. During their initial conversation, defendant told him:

> [he] and his wife were arguing in the parking lot. A guy come up and told him, "Hey, man, don't treat her that way. Don't talk to her that way." And he said, "F---- you: Mind your own business. If you don't, you know, I'll kill you." And [defendant] said that the guy went to go for his gun. And when the guy went for his gun, [defendant] got to his gun a little bit quicker. Said he—he cried on my shoulder. He said he really did not mean to kill the guy. He said that he was trying to back the guy away from him and the guy went to swat the gun like that. And when he swatted the gun, that the gun went off and caught him in the side of the head.

Defendant stayed with Venable for a few days until a U.S. Marshal came to the house, asked everyone for identification, and defendant turned himself in. During his stay, Venable heard defendant bragging about the 3 August incident. On cross-examination, defense counsel read to Venable a statement he had made to lead investigator Angelia Duckworth about what defendant had said to him. His statement did not state that defendant told Solis, "I'll kill you." It also mentioned that defendant thought someone had probably taken cocaine and a gun from Solis' possession before the police arrived at the scene. On re-cross examination, Venable clarified that defendant had only told him that Solis "went to go for his gun," but "never said he saw [a gun]."

Jeffrey Royal, who had been in jail with defendant while he awaited trial, testified that defendant told him two versions of what happened on 3 August 1999. In the first version, which corresponded generally with testimony by other witnesses, defendant stated that when Solis tried to talk to him about his wife, he told him to mind his own business and shot him, then drove away. Royal testified that defendant showed no remorse about Solis' death.

Dr. James Edwards, the pathologist who performed the autopsy on Solis testified that he died from a single gunshot wound to his head. In response to questions, he stated that he did not make a note in his report of any "stippling" effect on Solis' face or head from gunpowder. Such stippling, he stated, would have indicated to him that the shot happened at close range.

Crime scene agent Kathleen Myers testified that she took gunshot residue samples from Solis' hands at the scene on 3 August. Special Agent Tim Luper, a witness for the defense, testified that when he analyzed the gunshot residue samples taken from Solis, they revealed some residue on his hands. From the evidence gathered, Luper testified he could not make any conclusions as to whether Solis handled or shot the gun. Luper stated the results were "not consistent with [Solis] having fired a gun, but I can't eliminate that fact. I mean it's a possibility [Solis' hand was] in close proximity [to a gun]."

Other evidence or events at trial pertinent to this appeal are set out below.

_____

In his brief, defendant has presented arguments in support of only seven of the thirty assignments of error contained in the record on appeal. Assignments of error not addressed in an appellant's brief are deemed abandoned and will not be considered by this Court. N.C.R. App. P. 28(a), (b)(6) (2002). The assignments of error brought forward in defendant's brief are presented in three main arguments. Defendant contends that the trial court erred in (1) handling procedural and substantive issues relating to defendant's capacity to stand trial that arose during jury selection, (2) denying defendant's request to instruct the jury on the doctrine of self-defense, and (3) denying defendant's motion to dismiss the violent habitual felon charge and failing to instruct the jury that the State must prove defendant's identity with respect to that charge beyond a reasonable doubt. We disagree with all three arguments and hold that defendant received a fair trial.

I.

Defendant first argues the trial court erred in (a) failing to afford him a proper competency hearing at the start of trial, (b) denying his motion to continue when counsel indicated during the second day of jury selection that defendant appeared unable to assist in his defense, (c) failing to strike the jurors that had been accepted while defendant was incompetent, and (d) finding defendant competent to proceed

with trial. The events relevant to these various arguments are summarized together. On 19 May 2000, Dr. George Corvin issued a report stating that defendant was suffering mental impairment and was not capable of making a plea at that time. On motion of the State, defendant was committed on 26 May 2000 to Dorothea Dix Hospital for examination regarding his competency to proceed with trial. On 10 August 2000, Dr. Robert Rollins of Dorothea Dix Hospital issued a report indicating that defendant was competent to proceed. On 2 October 2000, the first day scheduled for defendant's trial, the trial court reviewed Dr. Rollins' report and found defendant was competent to proceed.

Jury selection began on 3 October; four jurors were accepted by the parties. On 4 October, counsel for defendant indicated to the trial court that defendant could not concentrate, assist in his defense, or remember selection of jurors from the day before. Defendant moved for a continuance in order to have defendant evaluated. The trial court denied the motion to continue but allowed counsel for defendant to try to find a physician to examine defendant. Jury selection continued and two prospective jurors were excused. Counsel for defendant was unable to locate a physician to examine defendant and again moved for a continuance. The trial court denied the motion but permitted the State to call Dr. Rollins. While awaiting the arrival of Dr. Rollins, the State questioned and accepted juror Marcia Dibens. Counsel for defendant advised that defendant was unable to give input as to juror Dibens. When Dr. Rollins arrived, the trial court took a short recess for the evaluation. Dr. Rollins then testified that defendant was having significant problems with concentration and recommended that defendant receive a week's treatment followed by a reevaluation. Without making any express findings as to defendant's competence, the trial court recessed for a week. On 10 October 2000, Dr. Rollins testified that defendant seemed less depressed and could assist counsel, but was still having problems with concentration and mental focus. Dr. Rollins stated that defendant's medication had not had time to take full effect and that a few weeks would produce significant change. Defense counsel then indicated to the trial court that defendant did not seem rational and moved for a continuance until the medication could take full effect. The court denied the motion and found defendant competent to proceed. Jury selection continued and the first four jurors, as well as juror Dibens, who was questioned and accepted by defendant on 10 October, were seated on the jury.

"It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to trial." *Drope v. Missouri*, 420 U.S. 162, 171, 43 L. Ed. 2d 103, 112-13 (1975). In North Carolina, G.S. § 15A-1002 outlines the procedure used to determine whether a defendant has the capacity to stand trial:

(a) The question of the capacity of the defendant to proceed may be raised at any time on motion by the prosecutor, the defendant, the defense counsel, or the court. The motion shall detail the specific conduct that leads the moving party to question the defendant's capacity to proceed.

(b) When the capacity of the defendant to proceed is questioned, the court shall hold a hearing to determine the defendant's capacity to proceed. If an examination is ordered . . ., the hearing shall be held after the examination. Reasonable notice shall be given to the defendant and prosecutor, and the State and the defendant may introduce evidence.

N.C. Gen. Stat. § 15A-1002 (2002). The question of whether a defendant has the capacity to stand trial is one within the trial court's discretion and, if supported by the evidence, its determination is conclusive on appeal. *State v. Heptinstall*, 309 N.C. 231, 306 S.E.2d 109 (1983); *State v. Willard*, 292 N.C. 567, 234 S.E.2d 587 (1977).

[1] Defendant first contends the trial court failed to conduct a hearing as contemplated by G.S. § 15A-1002(b) before its 2 October ruling that he was competent to stand trial. He argues that he did not receive reasonable notice of the hearing, defense counsel did not receive a copy of Dr. Rollins' 10 August report until the hearing, Dr. Rollins' report did not address the bases given for Dr. Corvin's 19 May opinion, and Dr. Rollins was not available for cross-examination at the hearing. It appears from the record that defense counsel raised the issue of a competency hearing by explaining to the trial court that he had never received a report from the examination ordered on 26 May and had determined that defendant had never been taken to Dorothea Dix Hospital for examination. After determining that the State's counsel also had not received a copy of the report, the trial court located the report in the case file and allowed both counsel to review and copy it. At that point, defense counsel asserted that having just received the report, and given the reasonable notice required for a competency hearing under the statute, he needed time to review the

report and discuss it with Dr. Corvin or another mental health professional. However, the trial court proceeded with a competency hearing at that time. Defense counsel did not offer any evidence of conduct by defendant which had given counsel concern about defendant's competency, but argued that Dr. Rollins' report seemed very cursory, did not address the issues raised by Dr. Corvin's report, and that Dr. Rollins was not available for cross-examination. The trial court then stated that it had "conducted a hearing pursuant to the information that's been given concerning [defendant's] competency to stand trial," considered arguments of counsel and the two physicians' reports, and concluded "that the defendant is competent to stand trial . . . ."

The State's 26 May motion raised the question of defendant's competency to proceed; an examination having been ordered, G.S. § 15A-1002(b) required the trial court to conduct a hearing, after the examination, to determine whether defendant was competent to proceed. There is no indication in the record that such a hearing was held prior to 2 October.

Although a trial court is required to hold a hearing after reasonable notice to the parties, " 'it is a general rule that a defendant may waive the benefit of statutory or constitutional provisions by express consent, failure to assert it in apt time, or by conduct inconsistent with a purpose to insist upon it.' " *State v. Young*, 291 N.C. 562, 567, 231 S.E.2d 577, 580 (1977) (citation omitted). In this case, defendant asserted his right to the statutorily required hearing and reasonable notice; the trial court provided defendant notice shortly before commencing the hearing. The operative question is whether such notice was reasonable.

The statute at issue does not define "reasonable notice." However, in *State v. Burney*, 302 N.C. 529, 276 S.E.2d 693 (1981), our Supreme Court upheld the denial of the defendant's motion to continue on facts similar to those in the instant case. In *Burney*, defendant made a motion about a month prior to trial questioning his capacity to proceed and a psychiatric examination was ordered pursuant to G.S. § 15A-1002, with provision that a copy of the examination report be sent to defense counsel. *Id.* at 531, 276 S.E.2d at 694. The report stated that the defendant was competent to stand trial.

> Prior to trial [] defendant moved for a continuance on the ground that a copy of the hospital's report had not been sent to his attorney as had been ordered . . . . The trial judge informed defense

**STATE v. WOLFE**

[157 N.C. App. 22 (2003)]

counsel that he had received a copy of the report that day and would be glad to furnish him a copy of it. Counsel stated that he felt that he was entitled to an opportunity to study the report at length, and to have defendant's own experts examine it.

Upon inquiry from the court, counsel stated that he had been informed previously that the report was in the clerk's office in a sealed envelope addressed to the presiding judge. He further stated that the clerk had suggested that he ask the presiding judge for a copy. Before ruling on the motion for a continuance, the court gave counsel time to read the report and go over it with defendant.

*Id.* at 531-32, 276 S.E.2d at 694-95 (footnotes omitted). In a footnote, the Court noted that the record did not indicate exactly when the defendant made the motion to continue, so the Court assumed it was the first day of trial. *Id.* at 531 n.1, 276 S.E.2d at 694 n.1. The Court also mentioned in another footnote that "[w]hile we cannot justify the . . . failure to send defendant's counsel a copy of the report as ordered . . ., we must note that with a minimum of effort counsel could have obtained a copy of the report sent to the presiding judge." *Id.* at 532 n.2, 276 S.E.2d at 695 n.2. Although there were other factors involved in the Court's holding that the trial court had not erred in denying the motion to continue, it is clear that the Court was not persuaded by the argument that defense counsel was entitled to a continuance because he had not received a copy of the report until the day of his motion to continue, presumably the first day of trial.

In the present case, the 26 May order for examination of defendant provided that copies of the examination report be sent to defendant's attorney and the clerk of court. On 2 October, the first day of trial, counsel for defendant stated to the court that he had asked defendant several times whether he had been taken to Dorothea Dix Hospital and he replied that he had not. The State indicated that it had spoken with employees at Dorothea Dix and learned that defendant had been examined, although not at the hospital, and the report sent to defendant and the clerk of court. Although there may have been miscommunication between defendant and his counsel concerning the facts of the examination, it does not appear that defense counsel made any further efforts to determine whether an examination had been conducted and a report made. As in *Burney*, minimal efforts such as a telephone call to the clerk or to Dorothea Dix Hospital would likely have turned up the report. Therefore, considering that counsel for defendant could have gotten access to Dr. Rollins' report

earlier, had a chance to look it over before the hearing, and had no evidence to present on the issue of defendant's competency other than Dr. Corvin's 19 May report, we cannot agree that the notice defendant received in this case was not reasonable.

For similar reasons, we also consider defendant's other contentions with regard to the 2 October hearing to be without merit. Defendant had an opportunity to be heard on Dr. Rollins' report at the hearing. Although the trial court did not make specific findings in its ruling, defendant does not assign error to this aspect of the order, and it is not clear from the brief that he contends the evidence presented at the hearing, i.e., the two reports, did not support the trial court's conclusion that defendant was competent to stand trial. In any event, Dr. Rollins' report clearly supports the trial court's conclusion and thus we may not disturb it on appeal. *Heptinstall, supra; Willard, supra.*

[2] Next, defendant contends the trial court erred in denying his motion to continue after defense counsel questioned his competency to proceed during jury selection on 4 October 2000. However, during the period between the trial court's ruling on the motion and the evaluation by Dr. Rollins, the only proceedings that took place were the State's questioning and excusal of a prospective juror for cause, the excusal of another prospective juror by the trial court based on his work schedule, and the State's questioning and acceptance of juror Dibens. Therefore, it appears that the trial court's ruling on the motion to continue was not the source of any prejudice to defendant. N.C. Gen. Stat. § 15A-1443 (2002). Moreover, after the evaluation, the trial court granted a week's recess for treatment of defendant, with a follow-up evaluation on 10 October.

[3] Defendant also contends the trial court erred in failing to strike *ex mero motu* the four jurors selected on 3 October. First, because defendant did not move to strike the jurors at trial, this issue is not properly preserved for appellate review. N.C.R. App. P. 10(b)(1) (2002). Defendant requests plain error review of the issue, but the plain error doctrine is limited to errors in jury instructions and the admission of evidence. *State v. Greene*, 351 N.C. 562, 528 S.E.2d 575, *cert. denied*, 531 U.S. 1041, 148 L. Ed. 2d 543 (2000); N.C.R. App. P. 10(c)(4) (2002). Second, it is not clear from the record that defendant was not competent on 3 October. To the extent the trial court reviewed any evidence other than Dr. Rollins' testimony after his evaluation of defendant on 4 October, we note that counsel for defendant, who initiated the evaluation, had clearly stated that

defendant's "mental condition this morning is fundamentally different from how it was on Monday and how it was yesterday." Counsel for defendant also made no assertions on 3 October that defendant was not communicating with them adequately. This argument is without merit.

**[4]** Lastly, defendant argues the trial court erred in denying his motion to continue on 10 October to allow the medication to take full effect. In the relevant assignment of error, defendant did not assign error to the denial of his motion to continue, but rather to the trial court's finding of competence as unsupported by the evidence. N.C.R. App. P. 10(a) (2002). However, Dr. Rollins stated specifically:

> Mr. Wolfe's depression is less in my view. He has more trouble focusing on things that are currently distressing than things in the past that are less distressing. But it's my view that he is able to concentrate and communicate sufficiently as to be able to proceed.

This statement is competent evidence that supports the trial court's finding of competence. In sum, we find no reversible error was committed by the trial court with respect to the competency determinations in this case and related motions and hearings.

## II.

**[5]** Defendant next contends the trial court erred in denying his request for a jury instruction on self-defense because the evidence supported such an instruction. "[A] defendant is entitled to a self-defense instruction 'if there is any evidence in the record from which it can be determined that it was necessary or reasonably appeared to be necessary for him to kill his adversary in order to protect himself from death or great bodily harm.' " *State v. Nicholson*, 355 N.C. 1, 30, 558 S.E.2d 109, 130, *cert. denied*, —— U.S. ——, 154 L. Ed. 2d 71 (2002) (quoting *State v. Bush*, 307 N.C. 152, 160, 297 S.E.2d 563, 569 (1982)).

Defendant asserts the evidence that Solis owned guns and was known by defendant to own guns and the fact that Solis had gunshot residue on his hands indicating that he may have handled or fired a gun just prior to his death supports the theory of self-defense. In addition, defendant points to the testimony by his brother Robert and Michael Venable as to statements by defendant indicating that he shot Solis before Solis could shoot him as evidence that defendant believed it was necessary to shoot Solis to defend himself. However,

the evidence showed that Solis did not carry a gun, that no gun was found on or near him on 3 August, and, amongst defendant's various versions of the incident, he never claimed that he saw Solis with a gun. The evidence is insufficient to raise the issue of whether defendant *reasonably* believed he had to shoot Solis to protect himself from death or great bodily harm; therefore, the trial court did not err in denying the request for a self-defense instruction.

### III.

**[6]** Defendant contends, in his final argument, that the trial court erred by denying his motion to dismiss the violent habitual felon indictment at the close of the evidence and by not instructing the jury that the State must prove defendant's identity with respect to this charge beyond a reasonable doubt.

> In ruling upon a motion to dismiss, the trial court must examine the evidence in the light most favorable to the State, giving the State the benefit of all reasonable inferences which may be drawn from the evidence. The court must determine whether substantial evidence supports each essential element of the offense and the defendant's perpetration of that offense. If so, the motion must be denied and the case submitted to the jury. " 'Substantial evidence' is that amount of relevant evidence that a reasonable mind might accept as adequate to support a conclusion."

*State v. Hairston*, 137 N.C. App. 352, 354, 528 S.E.2d 29, 30 (2000) (citations omitted). G.S. § 14-7.7 defines a violent habitual felon as:

> (a) Any person who has been convicted of two violent felonies . . ., in a court of this or any other state of the United States, . . . is declared to be a violent habitual felon. . . .
>
> (b) For purposes of this Article, "violent felony" includes the following offenses:
>
> > (1) All Class A through E felonies.
> >
> > (2) Any repealed or superseded offense substantially equivalent to the offenses listed in subdivision (1).
> >
> > (3) Any offense committed in another jurisdiction substantially similar to the offenses set forth in subdivision (1) or (2).

N.C. Gen. Stat. § 14-7.7 (2002). G.S. § 14-7.10 explains how the State may prove that a defendant has prior convictions of violent felonies:

A prior conviction may be proved by stipulation of the parties or by the original or a certified copy of the court record of the prior conviction. The original or certified copy of the court record, bearing the same name as that by which the defendant is charged, shall be prima facie evidence that the defendant named therein is the same as the defendant before the court, and shall be prima facie evidence of the facts set out therein.

N.C. Gen. Stat. § 14-7.10 (2002).

Defendant first argues that the State's proof was not substantial evidence that defendant had two prior felony convictions. The State submitted certified copies of two judgments entered upon felony convictions of a person named "Eldridge Frank Wolfe," thus establishing a *prima facie* case under G.S. § 14-7.10. However, defendant argues the proof is insufficient to show that he is the same person named in the judgments because, in one of the judgments the convicted person's race is noted as black, while defendant is white. "In creating this statutory *prima facie* case, the General Assembly has dictated what amount of evidence is sufficient for the judge to submit an habitual felon case to the jury." *Hairston*, 137 N.C. App. at 354-55, 528 S.E.2d at 31. Therefore, because the State has met the *prima facie* requirement, any discrepancies in other details contained in the judgments are for the jury to consider in weighing the evidence. *State v. Petty*, 100 N.C. App. 465, 397 S.E.2d 337 (1990). The trial court did not err in denying defendant's motion to dismiss on this basis.

[7] Defendant also argues, based on this discrepancy in race, the trial court erred in denying defendant's request that the jury be instructed that it must find beyond a reasonable doubt that defendant is the "Eldridge Frank Wolfe" named in both judgments. The jury was instructed as follows:

Now, I charge that for you to find the defendant guilty of being a violent habitual felon the State must prove two things beyond a reasonable doubt. First, that on or about December 11, 1985, Eldridge Frank Wolfe did commit the violent felony of voluntary manslaughter. And that on or about March 18, 1987, Eldridge Frank Wolfe was convicted of the violent felony of voluntary manslaughter . . . . Second, the State must prove beyond a reasonable doubt that on or about August 3rd, 1995, Eldridge Frank Wolfe did commit the violent felony of assault with a deadly weapon inflicting serious injury and that on or about March 12,

1996, Eldridge Frank Wolfe was convicted of assault with a deadly weapon inflicting serious injury . . . .

Defendant contends that this instruction would allow the jury to find him guilty of being a violent habitual felon if someone named Eldridge Frank Wolfe, but not necessarily the same person as defendant, had been convicted of those offenses. We are not persuaded by this argument; the references to Eldridge Frank Wolfe in the jury instruction as given could only have been understood by the jurors to refer to the defendant, who was on trial.

[8] Lastly, defendant argues the trial court erred in failing to dismiss the violent habitual felon charge because one of the felonies presented by the State, a 1987 voluntary manslaughter conviction, does not qualify for use as an underlying felony under G.S. § 14-7.7. Defendant contends that although voluntary manslaughter was a Class D felony at the time the instant case went to trial, it was a Class F felony in 1987. Defendant asserts that the State is not "authorized to elevate an offense classification from its previous class for purposes of satisfying violent habitual felony status." On the contrary, the State is specifically authorized by subsection (b)(2) of G.S. § 14-7.7 to use "[a]ny repealed or superseded offense substantially equivalent to the offenses listed in subdivision (1) [Class A through E felonies]." Voluntary manslaughter is exactly such a superseded offense, having been upgraded by the General Assembly to a Class D felony. N.C. Gen. Stat. § 14-18 (2002); *State v. Mason*, 126 N.C. App. 318, 484 S.E.2d 818 (1997), *cert. denied*, 354 N.C. 72, 553 S.E.2d 208 (2001).

[9] Defendant also contends that the use of the 1987 voluntary manslaughter judgment also violates the *ex post facto* provisions of the state and federal constitutions. U.S. Const., Art. I, §§ 9(3) and 10(1); N.C. Const., Art. I, § 16. "[A]n impermissible *ex post facto* law is one which, among other things, aggravates a crime or makes it a greater crime than when committed, or changes the punishment of a crime to make the punishment greater than the law permitted when the crime was committed." *Mason*, 126 N.C. App. at 324, 484 S.E.2d at 821. Because defendant's violent habitual felon status will only enhance his punishment for the second degree murder conviction in the instant case, and not his punishment for the underlying voluntary manslaughter felony, there is no violation of the *ex post facto* clauses. *Id.*

**[10]** Defendant further argues the holding in *State v. Mason* was incorrect because the violent habitual felon statute allows the use of felony judgments for enhancing punishment "when such action occurred on or after July 6, 1967," yet the statute was enacted in 1994. N.C. Gen. Stat. § 14-7.7 (2002). 6 July 1967 is the date the habitual felon statute, now G.S. § 14-7.1 *et seq.*, was enacted and the statute uses that date as a cut-off point for the felonies that can be used under it to enhance punishment. N.C. Gen. Stat. § 14-7.1 (2002). Thus, defendant argues that the violent habitual felon statute is an *ex post facto* law to the extent that it authorizes use of felonies committed between 1967 and 1994 to enhance punishment because offenders were not on notice between 1967 and 1994 that their offenses might thus be used in the future.

We reject the argument. Although the violent habitual felon statute was not enacted until 1994, perpetrators were on notice between 1967 and 1994, pursuant to the habitual felon statute, that certain crimes could be used to enhance punishment for later crimes.

Defendant received a fair trial and was sentenced according to law.

No error.

Judges STEELMAN and GEER concur.