STATE OF NORTH CAROLINA v. JOAN MYRTLE SHANNON

No. COA06-418

(Filed 3 April 2007)

**1. Evidence— prior crimes or bad acts—sexually suggestive photographs of defendant—motive**

The trial court did not err in a first-degree murder and conspiracy to commit first-degree murder case by admitting three sexually suggestive photographs of defendant from a "swingers" party of March 2002, because: (1) the photographs helped support the State's contention that defendant wanted to be with another man, and that this constituted a motive to kill the husband victim; (2) the evidence illustrated the chain of events leading up to the victim's murder, and corroborated the existence of another man's sexual relationship with defendant; and (3) the probative value was not substantially outweighed by the danger of unfair prejudice when the trial court only permitted the admission of three of the eight photographs the State sought to introduce and directed that the photographs would be passed around to the jurors in a folder and not shown on an overhead projector.

**2. Evidence— defendant's sexual activities—pornographic and sex-related items—testimony about "Fayetteville Gang Bangers"**

The trial court did not commit plain error in a first-degree murder and conspiracy to commit first-degree murder case by admitting evidence of defendant's sexual activities, pornographic and sex-related items, and testimony about the "Fayetteville Gang Bangers," because: (1) evidence regarding the Fayetteville Gang Bangers and defendant's sexual activities had probative value to help illustrate the swinger lifestyle, showed the events leading to defendant's relationship and desire to be with another man, and explained the story of the crime for the jury; and (2) the trial court's admission of the evidence, even if error, was not so fundamental as to result in a miscarriage of justice, nor would a different result have occurred in the absence of such evidence.

**3. Discovery— renewed discovery motion—prosecutors required to disclose, in written or recorded form, witness statements during pretrial interviews**

The trial court erred by denying defense counsel's renewed discovery motion during trial seeking notes of one or more pre-

STATE v. SHANNON

[182 N.C. App. 350 (2007)]

trial conversations or interviews that the prosecutor had with one of defendant's daughters, and defendant's assertion is treated as a motion for appropriate relief with the case being remanded for an evidentiary hearing, because: (1) the amended version of N.C.G.S. § 15A-903(a)(1) requires prosecutors to disclose, in written or recorded form, statements made to them by witnesses during pretrial interviews; and (2) trial preparation interview notes might be discoverable except where they contain the opinions, theories, strategies, or conclusions of the prosecuting attorney or the prosecuting attorney's legal staff.

Judge MCCULLOUGH concurring in part and dissenting in part.

Appeal by defendant from judgments entered 31 August 2005 by Judge James Hardin in Cumberland County Superior Court. Heard in the Court of Appeals 11 December 2006.

*Attorney General Roy Cooper, by Assistant Attorney General, Amy C. Kunstling, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender, Constance E. Widenhouse, for defendant.*

LEVINSON, Judge.

Joan Mrytle Shannon (defendant) appeals judgments entered upon her convictions for first degree murder and conspiracy to commit first degree murder. We conclude that the trial court judge did not err by admitting evidence related to defendant's "swinger" lifestyle. We also conclude, with respect to an issue of first impression, that N.C. Gen. Stat. § 15A-903(a)(1) (2005) requires prosecutors to disclose, in written or recorded form, statements made to them by witnesses during pretrial interviews.

In the instant case, defendant was married to David Shannon (Shannon), who served in the United States Military. Defendant and Shannon lived in Fayetteville, North Carolina with Daisy Shannon (Daisy) and Elizabeth Shannon (Elizabeth), defendant's biological daughters.

Defendant and Shannon were members of the "Fayetteville Gang Bangers", a "swingers" club. Jeffrey Wilson testified that defendant and Shannon contacted him online through the internet in November or December 2001. After they began corresponding online, Shannon asked Wilson if he wanted to have sex with defendant. Wilson further

testified that Shannon told him about the "Fayetteville Gang Bangers," and encouraged him to add his name to their e-mail list to receive party notifications. Over the course of the next three months, Wilson went to "Fayetteville Gang Bangers" parties.

Wilson attended a "Fayetteville Gang Bangers" party in February 2002. Defendant and Shannon also attended this party, which was hosted at a motel in adjoining rooms. One room was the "meet and greet" room where people talked, and the other was the "party" room where people engaged in sexual activities. Defendant and another woman approached Wilson and indicated they wanted to engage in sexual relations with him. Defendant and the other woman performed oral sex on Wilson. Wilson then had vaginal sex with defendant while defendant performed oral sex on another man.

Wilson testified that around March 2002, he went to a party hosted by Tony Bennett (Bennett). At this party, defendant undressed while Shannon took photographs. Wilson and two other men took turns having vaginal and oral sex with defendant while Shannon photographed them. Shannon then had sex with defendant while Wilson photographed them. A few days thereafter, defendant asked Wilson how he felt about "seeing her on a regular basis." Wilson asked defendant if it would be a problem with Shannon. Defendant informed Wilson that it would be acceptable with Shannon as long as it was not "serious." Wilson and defendant's relationship became more personal and they began to appear in public together. Defendant told Wilson she "loved" him and could see herself being with him.

Elizabeth Shannon testified that in April 2002, she heard defendant talking on the telephone with Wilson. During the course of the conversation, defendant stated, "[Shannon] rides on planes all the time. Why can't one of his planes just go down?" Elizabeth also testified that defendant attempted to poison Shannon several times in late April and early May of 2002. And, according to Elizabeth, defendant once asked Daisy if she knew where she could acquire the "date rape drug" to administer to Shannon. Shannon had over $700,000.00 in life insurance, and defendant was the named beneficiary on his policies. Additionally, because Shannon was on active military duty, defendant would be entitled to monthly military benefits for herself and their minor children if Shannon died.

Defendant asked Elizabeth if she knew "anybody that would be able to shoot [Shannon]." Defendant said that she wanted to be with Wilson, and could not afford to leave Shannon. Elizabeth told defend-

ant that she would talk to her friend, Anthony Jones (Jones), about obtaining a gun. When Jones refused to help, Elizabeth contacted Donald White (White) and asked him if he would kill Shannon for money. White refused.

When Elizabeth could not find anyone to kill Shannon, defendant began pressuring Elizabeth to do it herself. Shortly before Shannon's murder, Elizabeth testified, defendant showed her a gun belonging to Shannon. Defendant loaded the gun and instructed Elizabeth on how it worked. Defendant put the loaded gun, bullets, and surgical gloves in a drawer in Elizabeth's room. The next day, 22 July 2002, Elizabeth told defendant, "I'll do it."

Vera Thompson, Elizabeth's friend, was staying at the Shannon's home the night of the killing. At approximately 11:00 p.m., defendant went into Elizabeth's bedroom and told her that she and Shannon were going to bed. After putting on surgical gloves and sweat clothes over a layer of clothes, Elizabeth went into the bedroom Shannon shared with defendant. Defendant had instructed her to do these things. Shannon and defendant were lying on the bed. When Elizabeth shot Shannon in the head, Shannon began breathing erratically. Believing he was not dead, Elizabeth shot him in the chest. After the second shot, defendant crawled to the end of the bed and grabbed the cordless phone. Defendant asked Elizabeth and Thompson to dispose of the gun. Thereafter, according to Elizabeth, defendant stated, "I need to think of something to cry about." Defendant was overheard crying on the phone, stating, "someone has broke[n] into the house and shot my husband."

Officer Faneal Godbold (Godbold) of the Fayetteville Police Department responded to a 911 call at 3:07 a.m. on 23 July 2002 from a female who reported that her husband had been shot. Upon Godbold's arrival, defendant was crying. Defendant stated that "her husband had been shot" and that she did not know who did it. When Godbold and Sergeant Oates, also of the Fayetteville Police Department, entered the house, they found two sleeping boys in one bedroom and Elizabeth and Thompson awake, listening to music. The officers discovered Shannon in the master bedroom, lying naked on the bed with a sheet pulled midway up. He had bullet wounds to his forehead and chest. There were large quantities of blood everywhere, including blood splatter and brain matter on the bedroom wall. When Godbold told Elizabeth that her father had been shot, Elizabeth calmly inquired, "[d]id he die?"

Three firearms were recovered from the master bedroom of the Shannons' house. None of those firearms, however, was the murder weapon. Sexually-oriented videotapes and magazines, sexual devices, lubricants, and condoms were also recovered from the house. The cause of Shannon's death was close-range gunshot wounds to his head and chest.

A jury convicted defendant of first degree murder, conspiracy to commit first degree murder, and accessory after the fact to murder. The trial court arrested judgment on the offense of accessory after the fact to murder. Defendant appeals.

[1] In defendant's first argument on appeal, she contends that the trial court erred by admitting three sexually suggestive photographs of defendant. Specifically, defendant asserts that the photographs were irrelevant and, alternatively, unduly prejudicial. We disagree.

Relevant evidence is evidence which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2005). "Although [a] 'trial court's rulings on relevancy technically are not discretionary and therefore are not reviewed under the abuse of discretion standard applicable to Rule 403, such rulings are given great deference on appeal.' " *Dunn v. Custer*, 162 N.C. App. 259, 266, 591 S.E.2d 11, 17 (2004) (quoting *State v. Wallace*, 104 N.C. App. 498, 502, 410 S.E.2d 226, 228 (1991)). N.C. Gen. Stat. § 8C-1, Rule 404(b) (2005) provides, in pertinent part, that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident. . . .

It is well established that:

> Rule 404(b) is one of inclusion of relevant evidence of other crimes . . . subject to but one exception requiring its exclusion if its only probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged. [S]uch evidence is admissible as long as it is relevant to any fact or issue other than the defendant's propensity to commit the crime.

*State v. Patterson*, 149 N.C. App. 354, 362, 561 S.E.2d 321, 326 (2002) (internal quotation marks and citations omitted). Moreover, our Supreme Court has stated that:

> "[E]vidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or [if it] forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury."

*State v. Ratliff*, 341 N.C. 610, 618, 461 S.E.2d 325, 330 (1995) (quoting *State v. Agee*, 326 N.C. 542, 548, 391 S.E.2d 171, 174 (1990)).

In the instant case, three photographs from the "swingers" party of March 2002 were admitted by the trial court over defendant's objection. State's Exhibit 124 showed defendant wearing a piece of red lingerie pulled up to reveal portions of her lower body. She is shown lying next to Wilson, who had both of his hands near the vicinity of defendant's left leg. State's Exhibit 125 depicted defendant, nude, having vaginal sex with another individual while defendant performed fellatio on Wilson. State's Exhibit 126 showed defendant, wearing a black garter belt and stockings, having vaginal sex with Wilson while defendant held another man's penis in her left hand.

In accordance with *Ratliff* and *Agee*, the photographs helped support the State's contention that defendant wanted to be with Wilson and that this constituted a motive to kill Shannon. Additionally, the evidence illustrated the chain of events leading up to Shannon's murder, and corroborated the existence of Wilson's sexual relationship with defendant. For these reasons, we disagree with defendant's contentions that the photographs were not legally relevant.

Defendant also argues that even if the photographs were relevant, they were unfairly prejudicial and therefore inadmissable. We disagree.

Rule 403 of the North Carolina Rules of Evidence provides, in pertinent part, that:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

N.C. Gen. Stat. § 8C-1, Rule 403 (2005).

"Rule 403 calls for a balancing of the proffered evidence's probative value against its prejudicial effect. Necessarily, evidence which is probative in the State's case will have a prejudicial effect on the defendant; the question, then, is one of degree." *State v. Mercer*, 317 N.C. 87, 93-4, 343 S.E.2d 885, 889 (1986). The exclusion of evidence under Rule 403 is within the trial court's discretion and will be reversed on appeal upon a showing that the decision was manifestly unsupported by reason. *State v. Quinn*, 166 N.C. App. 733, 736-37, 603 S.E.2d 886, 888 (2004).

On this record, the trial court did not err by concluding that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice. We observe that the trial court only permitted the admission of three (3) of eight (8) photographs the State sought to introduce, and directed that the photographs would be passed around to the jurors in a folder and not shown on an overhead projector. Because the photographs were relevant, and because the trial court's Rule 403 determination is not unsupported by reason, the relevant assignments of error are overruled.

**[2]** In a related argument, defendant contends that the trial court committed plain error by admitting evidence of defendant's sexual activities; pornographic and sex related items; and testimony about the "Fayetteville Gang Bangers". We disagree.

As defendant failed to object to the admission of this evidence we review for plain error. *See State v. Wolfe*, 157 N.C. App. 22, 33, 577 S.E.2d 655, 663 (2003) (plain error review applies to admission of evidence and jury instructions). To establish plain error, a defendant must demonstrate "(i) that a different result probably would have been reached but for the error or (ii) that the error was so fundamental as to result in a miscarriage of justice or denial of a fair trial." *State v. Bishop*, 346 N.C. 365, 385, 488 S.E.2d 769, 779 (1997) (citations omitted). We "must examine the entire record and determine if the . . . error had a probable impact on the jury's finding of guilt." *State v. Pullen*, 163 N.C. App. 696, 701, 594 S.E.2d 248, 252 (2004) (internal quotation marks and citation omitted).

Like the three (3) photographs discussed above, evidence regarding the "Fayetteville Gang Bangers" and defendant's sexual activities had similar probative value. *See Ratliff*, 341 N.C. at 618, 461 S.E.2d at 330 (prior bad acts are admissible to show a chain of events). This evidence helped illustrate the "swinger" lifestyle; showed the events leading to defendant's relationship and desire to be with Wilson; and

explained the "story of the crime for the jury." *Id.* We conclude that the trial court's admission of the evidence, even if error, was not so fundamental as to result in a miscarriage of justice, and we are unpersuaded that a different result would have occurred in the absence of such evidence. The relevant assignments of error are overruled.

**[3]** In defendant's next argument on appeal, she presents an issue of first impression: the statutory meaning and application of the term "witness statements" under the amended version of N.C. Gen. Stat. § 15A-903(a)(1) (2005). Defendant contends that the trial court committed prejudicial error by denying her discovery motion that sought notes of one or more pretrial conversations or interviews the prosecutor's office had with Daisy Shannon and other witnesses. The record reflects that the trial court judge did not compel the prosecutor to reduce the substance of such interview(s) to writing, and this Court does not have such notes in the record.[1] Defendant's argument has merit.

We review a trial court's ruling on discovery matters under the abuse of discretion standard. *Morin v. Sharp*, 144 N.C. App. 369, 374, 549 S.E.2d 871, 874 (2001) (citation omitted). "A trial court may be reversed for abuse of discretion only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *In re J.B.*, 172 N.C. App. 1, 14, 616 S.E.2d 264, 272 (2005) (citation omitted). Additionally:

> When discretionary rulings are made under a misapprehension of the law, this may constitute an abuse of discretion. *See State v. Cornell*, 281 N.C. 20, 30, 187 S.E.2d 768, 774 (1972) (stating that "where rulings are made under a misapprehension of the law, the orders or rulings of the trial judge may be vacated and the case remanded for further proceedings, modified or reversed, as the rights of the parties and the applicable law may require"); Cf. *Ledford v. Ledford*, 49 N.C. App. 226, 234, 271 S.E.2d 393, 399 (1980) (concluding that the court's denial of a motion to amend was based on a misapprehension of the law, was an abuse of discretion and reversible error).

*Gailey v. Triangle Billiards & Blues Club, Inc.*, 179 N.C. App. 848, 851, 635 S.E.2d 482, 484 (2006).

---

1. The record reflects that the prosecutor stated the following to the trial court in regards to his interview with Daisy Shannon: "I was particular to write down all the things she said the defendant said, and I may have written down some of my impressions about what she told me, but I didn't have any notes. . . . [A]s for talking with [Daisy] and taking notes of everything she said, I didn't do that."

It is well-established in North Carolina that "[t]he right to . . . discovery is a statutory right." *State v. Taylor*, 178 N.C. App. 395, 401, 632 S.E.2d 218, 223 (2006). Consequently, in order to ascertain the correct meaning of a "witness statement", for the purpose of the instant case, it is necessary to evaluate the current and prior versions of G.S. § 15A-903.

The 2003 version of N.C. Gen. Stat. § 15A-903 required the State to produce witness statements:

> After a witness called by the State has testified on direct examination, the court shall, on motion of the defendant, order the State to produce any statement of the witness in the possession of the State that relates to the subject matter as to which the witness has testified. If the entire contents of that statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

N.C. Gen. Stat. § 15A-903(f)(2) (2003). N.C. Gen. Stat. § 15A-903(f)(5) (2003) defined the term "statement":

> The term 'statement,' as used in subdivision (2), (3), and (4) in relation to any witness called by the State means
>
> a. A written statement made by the witness and signed or otherwise adopted or approved by him;
>
> b. A stenographic, mechanical, electrical, or other recording, or a transcription thereof, that is a substantially verbatim recital or an oral statement made by the witness and recorded contemporaneously with the making of the oral statements.

Therefore, under the prior version of G.S. § 15A-903, unless a statement was signed or somehow adopted by a witness, the assertion would not qualify as a statement. *See State v. Shedd*, 117 N.C. App. 122, 125, 450 S.E.2d 13, 14-15 (1994) ("[E]ven if the trial court believed that [the witness] gave a statement, there is no evidence that [she] signed, adopted or otherwise approved of the statement. [Hence] there was no statement as defined in section 15A-903.").

However, on 1 October 2004, the General Assembly amended G.S. § 15A-903. In doing so, the legislature, *inter alia*, deleted the definition of the term "statement". The current version of the statute provides, in pertinent part, that:

(a) Upon motion of the defendant, the court must order the State to:

(1) Make available to the defendant the complete <u>files</u> of all law enforcement <u>and prosecutorial agencies</u> involved in the investigation of the crimes committed <u>or the prosecution of the defendant</u>. The term 'file' includes the defendant's statements, the codefendants' statements, <u>witness statements</u>, investigating officers' notes, results of tests and examinations, or any other matter or evidence obtained during the investigation of the offenses alleged to have been committed by the defendant. <u>Oral statements shall be in written or recorded form</u>. . . .

G.S. § 15A-903(a)(1) (2005) (emphasis added).

"Statutory interpretation properly begins with an examination of the plain words of the statute." *Correll v. Division of Social Services*, 332 N.C. 141, 144, 418 S.E.2d 232, 235 (1992) (citation omitted). In interpreting statutory language, "it is presumed the General Assembly intended the words it used to have the meaning they have in ordinary speech. When the plain meaning of a statute is unambiguous, a court should go no further in interpreting the statute." *Nelson v. Battle Forest Friends Meeting*, 335 N.C. 133, 136, 436 S.E.2d 122, 124 (1993) (citations omitted). "[I]f the legislature deletes specific words or phrases from a statute, it is presumed that the legislature intended that the deleted portion should no longer be the law." *Nello L. Teer Co. v. N.C. Dept. of Transp.*, 175 N.C. App. 705, 710, 625 S.E.2d 135, 138 (2006) (citations omitted). "[W]e follow the maxims of statutory construction that words of a statute are not to be deemed useless or redundant and amendments are presumed not to be without purpose." *Town of Pine Knoll Shores v. Evans*, 331 N.C. 361, 366, 416 S.E.2d 4, 7 (1992).

We first conclude that the former statutory definition of "statement" in G.S. § 15A-903(f)(5) no longer has application to the revised version of G.S. § 15A-903(a)(1). The definition was <u>completely omitted</u> from the current version of the statute and we presume, consistent with *Nello*, that it was the General Assembly's intention that the deleted portion of the statute no longer be the law of North Carolina. Moreover, again in contrast to the former version of the statute, amended 15A-903(a)(1) mandates that "[o]ral statements shall be in written or recorded form." The plain, unambiguous meaning of this requirement is that "statements" need not be signed or adopted by a witness before being subject to discovery.

**STATE v. SHANNON**

[182 N.C. App. 350 (2007)]

Notwithstanding the unambiguous requirements of G.S. § 15A-903(a)(1), the State contends the statutory definition of "statement" in the 2003 version still applies. It relies on *Dare County Bd. of Educ. v. Sakaria*, 127 N.C. App. 585, 588, 492 S.E.2d 369, 371 (1997), for the proposition that "when a term has obtained long-standing legal significance, we presume the legislature intended such significance to attach to its use of that term, absent indication to the contrary." In *Dare County*, the issue on appeal was directed to the statutory meaning of "date of taking" in condemnation proceedings as set forth in N.C. Gen. Stat. § 40A-53 (1984). In conducting its analysis, this Court noted that neither the current nor prior versions of the statute defined "date of taking." Despite a lack of statutory guidance, "pre-Chapter 40A case law uniformly held interest ran from the date of taking, interpreted as the date upon which the condemnor acquired the right to possession of the property." *Id.* at 588, 492 S.E.2d at 372. Accordingly, " 'date of taking' had acquired legal significance as a term of art for purposes of computation of interest at the time Chapter 40A was enacted, and [this Court was unable to ascertain any] legislative intent to deviate from this accepted common law meaning." *Id.* at 589, 492 S.E.2d at 372. This contrasts with the instant case, where the General Assembly has now <u>omitted</u> a statutory definition of "statement." In short, *Dare County* is not controlling authority.

We next conclude that a writing or recording evidencing a witness' assertions to a state prosecutor can qualify as a "witness statement" under Section 15A-903(a)(1). If, for example, Daisy Shannon made assertions to the prosecutor during pretrial interviews with her that are connected to the prosecution of defendant, they are discoverable. *See* Black's Law Dictionary 1444 (8th ed. 2004) ("statement" includes an "assertion"). The Cumberland County District Attorney's Office is, of course, a "prosecutorial agenc[y]" involved in the "prosecution of the defendant[,]" and its "files" are discoverable. G.S. § 15A-903(a)(1).

We next address several arguments by the State that a definition of "witness statements" in Section 15A-903(a)(1) that requires the disclosure of oral interviews and/or conversations between a prosecutor and a witness would lead to absurd consequences. *See State v. Jones*, 359 N.C. 832, 837 616 S.E.2d 496, 499 (2005) (courts tend to adopt an interpretation that avoids absurd results based on the presumption that the General Assembly acted in accordance with reason).

First, the State posits that it would be inconsistent to have different definitions of "witness statement" in criminal and civil discovery contexts. *Compare* G.S. § 15A-903(a)(1), *with* N.C. Gen. Stat. § 1A-1, Rule 26(b)(3) (2005) (defining "a statement previously made"). However, "given the high stakes of criminal prosecutions and the special protections traditionally afforded criminal defendants[,]" *Whitacre Partnership v. Biosignia, Inc.*, 358 N.C. 1, 30, 591 S.E.2d 870, 889 (2004), it is not untenable that the General Assembly would intend differing discovery requirements in criminal matters than civil ones.

Secondly, the State contends that failing to apply the former statutory definition of "statement" in G.S. § 15A-903(f)(5) would (1) "seriously undermine" work product protection, and (2) impose an affirmative duty on prosecutors to take notes of the interviews it conducts. However, with respect to the State's first contention, work product is still given protection. The current version of N.C. Gen. Stat. § 15A-904(a) (2005) provides:

> The State is not required to disclose written materials drafted by the prosecuting attorney or the prosecuting attorney's legal staff for their own use at trial, including witness examinations, voir dire questions, opening statements, and closing arguments. Disclosure is also not required of legal research or of records, correspondence, reports, memoranda, or <u>trial preparation interview notes</u> prepared by the prosecuting attorney or by members of the prosecuting attorney's legal staff <u>to the extent they contain the opinions, theories, strategies, or conclusions of the prosecuting attorney or the prosecuting attorney's legal staff</u>. (emphasis added).

The former version of G.S. 15A-904(a) provided:

> Except as provided in G.S. 15A-903(a),(b),(c) and (e), this Article does not require the production of reports, memoranda, or other internal documents made by the prosecutor, law-enforcement officers, or other persons acting on behalf of the State in connection with the investigation or prosecution of the case, or of statements made by witnesses or prospective witnesses of the State to anyone acting on behalf of the State.

Thus, consistent with our conclusions above concerning the disclosures required by the revised version of Section 15A-903(a)(1), the General Assembly expressly contemplates in the revised version of

Section 15A-904(a) that "trial preparation interview notes" might be discoverable except where they "contain the opinions, theories, strategies, or conclusions of the prosecuting attorney or the prosecuting attorney's legal staff." Stated alternatively, the current version of G.S. 15A-904 comports with the current version of G.S. 15A-903; and the former version of G.S. § 15A-904 comports with the former version of G.S. 15A-903.[2] As regards the State's contention that there is no affirmative obligation on the part of prosecutors "to take notes of interviews it conducts," we observe, again, that the amended version of Section 15A-903(a)(1) itself mandates that "[o]ral statements shall be in written or recorded form." And we reject outright the contention that every writing evidencing a witness' assertions to a prosecutor will necessarily include the prosecutor's "opinions, theories, strategies, or conclusions"—that which is still afforded protection under G.S. § 15A-904(a). See State v. Hardy, 293 N.C. 105, 126, 235 S.E.2d 828, 841 (1977) ("Only roughly and broadly speaking can a statement of a witness that is reduced verbatim to a writing or a recording by an attorney be considered work product, if at all. It is work product only in the sense that it was prepared by the attorney or his agent in anticipation of trial. . . . Such a statement is not work product in the same sense that an attorney's impressions, opinions, and conclusions or his legal theories and strategies are work product.").

We next reject the State's assertion that, because there is nothing to suggest that it did not comply with the constitutional discovery requirements set forth by Brady v. Maryland, 373 U.S. 83, 10 L. Ed. 2d 215 (1963); there can be no prejudice to defendant as a result of the prosecutor's failure to disclose the substance of his pretrial interview(s) with Daisy or other witnesses. Whatever the constitutional requirements to disclose exculpatory evidence to the accused, the statutory issue implicated by G.S. § 15A-903(a)(1) in the instant case is wholly different. The legislature has, by its amendments to G.S. § 15A-903, assured the accused greater access than that afforded by simple due process.

The trial court erred by misapprehending the application of the amended version of G.S. § 15A-903(a)(1) when ruling on defendant's motion to compel discovery of the pretrial interview(s) the prosecu-

2. "The revised version of G.S. § 15A-904 reflects the narrower version of the [work product doctrine]. It continues to protect the prosecuting attorney's mental processes while allowing the defendant access to factual information collected by the state." John Rubin, *Administration of Justice*, N.C. Institute of Government, Bulletin 2004/06, page 8.

tor had with Daisy Shannon and other witnesses. Because the trial court judge did not require the prosecutor to provide, in written or recorded form, any "witness statements," we are necessarily unable to determine whether the trial court's misapprehension of the discovery statute and its resulting ruling prejudiced the outcome of the trial. *See* N.C. Gen. Stat. § 15A-1443(a) (2005) ("A defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises."). We therefore treat defendant's assertions as a motion for appropriate relief in this Court, and remand the same for an evidentiary hearing.

As any experienced criminal practitioner will recognize, our decision leaves many unanswered questions concerning the particular applications and impact of the amended version of G.S. § 15A-903. This decision—necessitated by the General Assembly's collective will that the statutory scope of discovery be expanded—will result in a marked change in the discovery practices in criminal cases in North Carolina. Particularly here, where the issue on appeal concerns statutory discovery, it is "not the province of this Court to superimpose our own determination of what North Carolina's public policy should be over that deemed appropriate by our General Assembly." *Jarman v. Deason*, 173 N.C. App. 297, 299, 618 S.E.2d 776, 778 (2005).

No error in judgment; motion for appropriate relief remanded.

Judge HUNTER concurs.

Judge McCULLOUGH concurring in part and dissenting in a separate opinion.

McCULLOUGH, Judge, concurring in part and dissenting in part.

I concur in so much of the majority opinion that concludes that the trial of this defendant was conducted free of error.

I dissent from the majority's remand for an evidentiary hearing to determine if the prosecutor's failure to memorialize his conversation with Daisy Shannon resulted in prejudice.

The discovery statute at issue, N.C. Gen. Stat. § 15A-903(a)(1) (2005) does broaden the defendant's right to have all of witness's statements made to an investigator, whether or not adopted by that

witness. The statute makes the complete files of all law enforcement and prosecutorial agencies involved in the investigation and prosecution of the crime available. A witness's statement made during the investigation or prosecution must be turned over.

As the majority notes, the work product of the prosecuting attorney is still given protection, however. The pertinent statute states: "The State is not required to disclose written materials drafted by the prosecuting attorney or the prosecuting attorney's legal staff for their own use at trial, including *witness examinations,* voir dire questions, opening statements, and closing arguments." N.C. Gen. Stat. § 15A-904(a) (2005) (emphasis added). It is our duty to reconcile both statutes and give meaning to each, if possible.

In the case at bar the Assistant District Attorney stated that he would have provided the defense with any exculpatory material had there been any, but only made notes to assist him in questioning the witness.

The majority evidently agrees that when a prosecutor writes down the questions he or she intends to ask the witness, that constitutes his or her "work product" and is protected pursuant to N.C. Gen. Stat. § 15A-904. Such writings are "materials drafted by the prosecuting attorney . . . for their own use at trial, including witness examinations . . . ." *Id.* Such questions necessarily reveal the prosecutor's "opinions," "strategies," "theories," or "conclusions," all of which are similarly protected. *Id.*

In the majority view this does not relieve the prosecutor of his or her duty under N.C. Gen. Stat. § 15A-903 regarding the memorialization of a witness's "oral statements." To meet this obligation the prosecutor must either tape-record his witnesses' responses or prepare a written summary of those responses.

To follow the majority's logic, when a prosecutor meets with a witness and asks the witness questions, prepares the witness, and records his intended questions for that witness, he or she must simultaneously prepare a written or tape-recorded copy of the witness's responses for production to the defense. That would leave no protection for the prosecutor's "work product."

This rule places an unnecessary burden on the prosecutor, for it would apply to every witness the prosecutor interviews prior to trial, not just those who, like Daisy Shannon, had never been previously interviewed.

I do not believe the legislature intended to place such a huge, redundant administrative burden on the District Attorney, nor do I believe the legislature intended to so thoroughly eviscerate the prosecutor's "work product" exclusion.

Thus, I dissent.