IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA20-665-2

Filed 31 December 2024

Randolph County, No. 17 CRS 52825

STATE OF NORTH CAROLINA

v.

WENDY DAWN LAMB HICKS

On remand by plurality opinion of the Supreme Court of North Carolina in *State v. Hicks*, 385 N.C. 52, 891 S.E.2d 235 (2023), reversing and remanding a published opinion by a unanimous panel of the Court of Appeals in *State v. Hicks*, 283 N.C. App. 74, 872 S.E.2d 152 (2022) ("*Hicks I*"). Originally heard in the Court of Appeals on 13 April 2021.

*Attorney General Joshua H. Stein, by Special Deputy Attorney General Michael T. Henry, for the State.*

*Marilyn G. Ozer, for the Defendant.*

WOOD, Judge.

This case returns to us on remand from the Supreme Court of North Carolina for the limited purpose of considering Defendant's additional issue not reached by this Court in *Hicks I*: whether the trial court committed plain error by allowing a significant number of text messages and enlarged images to be published to each member of the jury without limiting instructions. After careful review of the Supreme Court opinion and the arguments advanced by the parties, we vacate the judgment entered against Defendant and remand for a new trial.

## I.    Factual and Procedural Background

The underlying facts of this case are set forth fully in *Hicks I* and the subsequent Supreme Court opinion; we briefly summarize as set forth herein.

Wendy Hicks ("Defendant") and the deceased, Caleb Adams ("Caleb"), met in September 2015 through their employment at Dart Container. Although both were married, they soon developed an intimate relationship that lasted until Caleb's death on 13 June 2017. Caleb was married to Dana Adams ("Dana") and remained so until Caleb's death. Defendant divorced her husband in April 2016. Both Defendant and Caleb also maintained intimate relationships with other individuals, and Defendant tried to hide her other relationships from Caleb.

In early 2017, Caleb introduced Defendant to methamphetamine. According to Defendant, Caleb could become angry when using methamphetamine. After Caleb's methamphetamine supplier was arrested, Defendant introduced Caleb to a new supplier, Doug. Defendant began performing oral sex on Doug to pay for methamphetamine and started an intimate relationship with him, which she attempted to hide from Caleb.

On 23 May 2017, Defendant posted a photo on Facebook of her and Caleb kissing. Dana saw this photo and confronted Caleb, who denied that he was the man in the photo. On 8 June 2017, Defendant called Dana and informed her that Caleb was having an affair and using drugs.

During the week of 12 June 2017, Defendant and Caleb had several arguments,

including one about the photo she posted on Facebook. According to Defendant, Caleb was also upset and angry because his supplier raised the price of methamphetamine, and he was concerned about owing people money.

On the morning of 12 June 2017, Caleb visited Defendant's trailer where she lived with her seventeen-year-old daughter, April. April testified that she awoke that morning and heard her mother and Caleb arguing. She further testified that Caleb threw open the door to the residence, causing the door to hit a dog gate. Caleb entered the home and screamed profanities and threats at Defendant. According to April, Caleb stated, "I've never hit a bitch but you're pushing me to hit a bitch. You're ruining my life. You're ruining my family." Caleb then left the trailer.

That evening, Caleb texted Defendant numerous times, and Defendant told him she would leave his drugs on the nightstand in her bedroom. At approximately 9:15 p.m., Caleb picked up his drugs. At approximately 11:30 p.m., Defendant texted Caleb, threatening to send sexually explicit photos to Dana to expose their affair.

At approximately midnight, Defendant called Dana, identified herself, and revealed that she and Caleb were having an affair. She further revealed Caleb was using recreational drugs. Defendant informed Dana that she and Caleb had been arguing, Caleb had threatened her, and she was concerned for her safety. Defendant asked Dana if Caleb was ever a violent person. Dana explained she was not aware of Caleb's outburst on the morning of 12 June 2017. Dana also stated that Caleb had never been violent with her and admitted he needed assistance concerning his

3

substance abuse. Defendant informed Dana she had a gun, and Dana told Defendant to call the police if she felt threatened by Caleb.

Later that night, an unknown man stood in Defendant's yard and yelled, "[W]here's Caleb?" Defendant told him Caleb was not there, and the men told Defendant to tell Caleb to "call his people." Defendant then called Caleb numerous times. His reply text stated, "You'll be lucky if you don't end up in a ditch."

At 5:58 a.m. on 13 June 2017, Caleb called Defendant and told her he was on the way to her home. At 6:13 a.m., Defendant texted Doug, "He [on the way] here." At 6:14 a.m., she texted Caleb, "No, please don't come here. They looking for you." At 6:28 a.m., she texted Doug, "He here."

At 6:30 a.m., Defendant called 911 and told the operator that she had shot Caleb. April was home at the time and although she did not see Defendant, she testified as to what she heard from her room. She testified that Defendant burst into the home and slammed the door as he had done the previous morning. She heard Caleb tell Defendant that he was going to kill her. She could hear that they engaged in a physical struggle violent enough to move furniture.

According to Defendant, Caleb was angry when he arrived at her home. He came into the trailer and entered her bedroom to try to take her phone. When she refused to hand over her phone, Caleb grabbed her gun from the nightstand.[1] At

---

[1] Our Supreme Court notes that from here, Defendant's accounts differ. *Hicks*, 385 N.C. at 56, 891 S.E.2d at 239.

4

trial, Defendant testified that upon taking her gun, Caleb removed it from its holster and pointed it at her, and she threw her phone at him. Caleb then looked through her phone and started to leave with the gun. She told him to leave the gun there, and he came back and threw down the gun onto the nightstand. Defendant then picked up the gun and tried to walk past Caleb, who then grabbed her arm and stomped on her feet. She tried to break free, but Caleb pinned her arm. Defendant then shot Caleb. Caleb walked past her and then dropped face-down on the floor.

Defendant had given other accounts of the shooting to law enforcement officers prior to trial. To the deputies who arrived at the scene, she explained that after Caleb took the gun from her nightstand, he tried to grab her in an attempt to take her phone. He dropped the gun while doing so, and she picked up the gun and shot him.

Later on, the day of the shooting, Defendant gave her account to two detectives at the sheriff's office. She did not tell them that Caleb dropped the gun. Rather, she explained that after she refused to relinquish her phone, a wrestling match ensued during which the gun and phone somehow switched hands, and she shot Caleb. She stated she could not remember how she obtained the gun or removed it from the holster.

Police arrived and found Caleb lying on his back on the floor, halfway through the bedroom doorway. An officer found a key fitting Defendant's front door near Caleb's leg and a "smoke vape" or "vape smoker." Defendant told an officer at the scene that the key belonged to Caleb and that he had used it to enter her home. Both

gunshot wounds entered Caleb's back, and either could have caused his death. There was no stippling, which may be caused when unburnt gunpowder strikes the skin and causes a superficial injury. An expert for the State testified this indicates the gun was shot from more than six inches away.

Nothing was broken in the house or bedroom. Although the front door was broken at one of its hinges, Defendant told the detectives during questioning that this had occurred before Caleb's visits to her house during the week of June 12. Defendant did not mention the broken door during her testimony at trial. April testified she did not know when it occurred.

A forensic toxicologist testified that the level of methamphetamine in Caleb's blood was 1.5 milligrams per liter and the level of amphetamine was .12 milligrams per liter. The toxicologist testified that using methamphetamine can cause heightened alertness, aggression, paranoia, violence, and sometimes psychosis.

At the scene, Defendant did not appear to be injured and did not mention she was suffering any pain. When she was first questioned by the detectives, she had no bruises. Approximately four hours later, however, the detectives noticed what appeared to be bruises starting to develop. The photographs of the bruising were presented at trial.

On 11 July 2017, Defendant was indicted for second-degree murder. Defendant's case came on for trial during the 18 November 2019 criminal session of Randolph County Superior Court. The jury convicted Defendant of second-degree

murder. The trial court sentenced her in the mitigated range to 180-228 months of imprisonment. Defendant appealed, arguing the trial court erred in instructing the jury on the aggressor doctrine. In *Hicks I*, in its unanimous opinion filed 19 April 2022, this Court held the trial court erred in instructing the jury on the aggressor doctrine. 283 N.C. App. at 84, 872 S.E.2d at 159. This Court's decision to order a new trial for Defendant made it unnecessary to address her arguments regarding the State's Exhibits 174 and 175. *Id.* at 84, 872 S.E.2d at 160.

In its opinion filed 1 September 2023, our Supreme Court reversed the decision of this Court and remanded the matter to this Court "for consideration of Defendant's argument that the trial court committed plain error in admitting Exhibits 174 and 175 into evidence." 385 N.C. at 65, 891 S.E.2d at 244.

## II. Analysis

Defendant argues the trial court plainly erred in admitting Exhibits 174 and 175. We agree.

## A. Standard of Review

Generally, "to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(a)(1). Nevertheless, "[i]n criminal cases, an issue that was not preserved by objection noted at trial . . . may be made the basis of an issue presented on appeal when the judicial action questioned is

7

specifically and distinctly contended to amount to plain error." N.C. R. App. P. 10(a)(4).

Here, Defendant "specifically and distinctly" contends in her appellate brief that the trial court erred in admitting Exhibits 174 and 175 and erred in the manner by which the exhibits were published to the jury. The State argues that any error was invited error and therefore Defendant has waived appellate review altogether. Therefore, as an initial matter, we must determine whether Defendant invited the alleged error about which she now complains.

The doctrine of invited error is codified in N.C. Gen. Stat. § 15A-1443, which states in pertinent part, "A defendant is not prejudiced by the granting of relief which he has sought or by error resulting from his own conduct." N.C. Gen. Stat. § 15A-1443(c). "Under the doctrine of invited error, a party cannot complain of a charge given at his request, or which is in substance the same as one asked by him." *State v. Miller*, 289 N.C. App. 429, 432–33, 889 S.E.2d 231, 234 (2023) (brackets and citation omitted). "Ordinarily one who causes (or we think joins in causing) the court to commit error is not in a position to repudiate his action and assign it as ground for a new trial. . . . Invited error is not ground for a new trial." *State v. Payne*, 280 N.C. 170, 171, 185 S.E.2d 101, 102 (1971). "Thus, a defendant who invites error has waived his right to all appellate review concerning the invited error, including plain error review." *State v. Crane*, 269 N.C. App. 341, 343, 837 S.E.2d 607, 608 (2020) (citation omitted).

"Our courts have consistently applied the invited error doctrine when a defendant's *affirmative actions directly precipitate* error." *Miller*, 289 N.C. App. at 433, 889 S.E.2d at 234 (emphasis added). In *Miller*, the defendant argued on appeal that the trial court plainly erred in admitting portions of a recorded interview between himself and law enforcement. The State argued the invited error doctrine applied where "(1) Defendant, through counsel, actively cooperated with the State to determine the appropriate redactions to his videotaped interview; (2) the redactions to the video were for the benefit of Defendant; and (3) Defendant agreed to the admission of the redacted video and its publication to the jury." *Id.* at 432, 889 S.E.2d at 234.

In determining whether the invited error doctrine applied, the Court in *Miller* considered two cases in which North Carolina courts applied the invited error doctrine. *Id.* at 433, 889 S.E.2d at 234. First, in *State v. Barber*, the defendant argued on appeal that the trial court erred in failing to redact a polygraph examination that was published to the jury. *State v. Barber*, 147 N.C. App. 69, 73–74, 554 S.E.2d 413, 416 (2001). This Court held the invited error doctrine applied where the defendant requested that an exhibit "be submitted to the jury, despite explicit warnings by the trial court that defendant's statement had not been properly redacted." *Id.* at 74, 554 S.E.2d at 416. Second, in *State v. Roseboro*, the defendant sought to admit testimony from one of his witnesses for corroborative purposes only. *State v. Roseboro*, 344 N.C. 364, 372, 474 S.E.2d 314, 318 (1996). The trial court asked defense counsel for

confirmation: "This evidence is offered for the purpose of corroborating?" Defense counsel replied, "Yes, sir, it is. Yes, sir." On appeal, however, the defendant argued that the witness's statements were admissible as substantive evidence. Our Supreme Court held that the invited error doctrine applied where the "defendant unequivocally agreed that he offered [the witnesses'] testimony for purposes of corroboration." *Id.* at 372–73, 474 S.E.2d at 318.

The Court in *Miller* also considered two cases in which this Court declined to apply the invited error doctrine. *Miller*, 289 N.C. App. at 433, 889 S.E.2d at 234–35. First, in *State v. Chavez*, this Court held the invited error doctrine did not apply where the defendant "did not request the conspiracy instruction, but merely consented to it." *State v. Chavez*, 270 N.C. App. 748, 757, 842 S.E.2d 128, 135 (2020), *rev'd on other grounds*, 378 N.C. 265, 861 S.E.2d 469 (2021). Second, in *State v. Harding*, this Court declined to apply the invited error doctrine and explicitly held that the defendant's argument was not precluded from plain error review where the defendant "failed to object, actively participated in crafting the challenged instruction, and affirmed it was 'fine.'" *State v. Harding*, 258 N.C. App. 306, 311, 813 S.E.2d 254, 259 (2018). The Court in *Harding* noted:

> Even where the trial court gave a defendant numerous opportunities to object to the jury instructions outside the presence of the jury, and each time the defendant indicated his satisfaction with the trial court's instructions, our Supreme Court has not found the defendant invited his alleged instructional error but applied plain error review.

*Id.* (quotation marks and brackets omitted).

Ultimately, the Court in *Miller* held that although the defense counsel "agreed with the State on certain portions that were redacted from the interview, and . . . did not object to the redacted interview being published to the jury," the invited error doctrine did not apply because he did not take "any affirmative action to introduce the redacted interview." *Miller*, 289 N.C. App. at 433, 889 S.E.2d at 235.

Here, Defendant did not affirmatively seek admission of Exhibits 174 and 175 or that they be published to the jury in a prejudicial manner. First, Defendant did not stipulate to the admission of the exhibits. Prior to trial, the Prosecutor and defense counsel discussed certain stipulations with the trial court. The trial court confirmed the items to which the parties stipulated: first, defense counsel stipulated to the authenticity of State's Exhibit 179, which showed a portion of call records from Defendant's phone; and second, the State stipulated to allowing Defendant's expert witness from Raleigh, North Carolina rather than one from Dallas, Texas to testify to the results of a Cellebrite extraction of a cell phone. Neither the parties nor the trial court specifically mentioned any stipulation to the admission of Exhibits 174 and 175.

During the conversation regarding stipulations, the Prosecutor stated:

> Judge, I do want to put on the record, I've spoken with [defense counsel] about this, the State intends to offer cumulus cell phones records, SMS texts, between the parties, the victim and the Defendant. I've made roughly 18 copies. Because of the cumbersome nature of it I would

> like permission to, once I've laid the foundation for admitting them, when we get to testifying about the content of those records, *to allow the jurors to actually hold their copies of the record, do kind of a read-along silently while we go through them simply because of the nature of the texts*.

Presumably, the "cumulus cell phone records [and] SMS texts" to which the Prosecutor referred were State's Exhibits 174 and 175, which the evidence log described as, respectively, "Report for Galaxy S7, SMS text msgs" and "Report for Galaxy S7, multimedia msgs." The trial court replied, "Well, if they're admitted before the read-along occurs, I don't have any trouble. I think I can probably do that in the Court's discretion, without a stipulation, but I mean they'll have to be admitted first." The Prosecutor replied:

> They're going to be admitted for witness prior to that but because of the nature of the -- just the nature of the records, how many there are and we're going to be flipping back and forth, I wanted to bring that to Your Honor's attention and I've spoken to Mr. Wells about it, just to go ahead and make sure that's okay before I start handing stuff out.

The trial court asked if defense counsel wished to be heard on the matter, and he replied, "I think that's probably a pretty good idea. I might want to use the same method in cross-examination or with [Defendant's expert witness] Mr. Green when the time comes."

This conversation does not indicate that defense counsel affirmatively requested that the jurors hold copies of State's Exhibits 174 and 175, that the entirety of Defendant's texts be submitted to the jury unredacted, nor that certain graphic

12

images be enlarged. Although defense counsel stated, "I think that's probably a pretty good idea," this response is not an affirmative request to the trial court to publish the exhibits in the way they were published. Defense counsel's acquiescence, or failure to object, is more akin to a defense counsel's "mere consent" to an allegedly errant instruction or a defense counsel's statement that an allegedly errant instruction was "fine," which are both circumstances in which this Court declined to apply the invited error doctrine. *Chavez*, 270 N.C. App. at 757, 842 S.E.2d at 135; *Harding*, 258 N.C. App. at 311, 813 S.E.2d at 259. A defense counsel's failure to object is specifically the scenario in which our Rules of Appellate Procedure provide for plain error review. N.C. R. App. P. 10(a)(4).

Furthermore, as discussed *supra*, defense counsel *did not* stipulate to the admission of Exhibits 174 and 175 into evidence. The record is totally devoid of any evidence to support otherwise. The trial court confirmed with the parties that defense counsel stipulated to the authenticity of Exhibit 179, and the State stipulated to an expert witness testifying regarding an extraction from a cell phone. Thereafter, defense counsel never stipulated to the admission of Exhibits 174 or 175 into evidence nor that identical copies of the exhibits be published to each member of the jury to hold from the moment of publication for, presumably, the duration of the trial.

In *State v. Betts* this Court contemplated whether the invited error doctrine applied when the defendant's counsel stipulated that she had no objection as to the admissibility of the disputed evidence *if* the State made certain redactions. *State v.*

*Betts*, 267 N.C. App. 272, 833 S.E.2d 41 (2019). In that case, a social worker conducted a forensic interview of a minor child whom the defendant allegedly had touched inappropriately. *Id.* at 274, 833 S.E.2d at 43. The social worker wrote a report on the interview. At trial, the State sought to admit the report into evidence. Defense counsel initially objected but did not object to the entry of a redacted version. *Id.* at 276, 833 S.E.2d at 44. On appeal, the defendant argued the trial court plainly erred in admitting the report. *Id.* at 282, 833 S.E.2d at 48.

This Court noted that after defense counsel's initial objection to the admission of the report at trial, the trial court held a colloquy on the matter, and "defense counsel stated she would not object to the . . . [r]eport, if the State were to make certain redactions." *Id.* at 283, 833 S.E.2d at 48. The trial court allowed the State, with defense counsel's consent, to review and redact the report during an evening recess and further ruled that defense counsel would have an opportunity to review the redacted version. The next day, after reviewing the redacted version of the report, defense counsel affirmed to the trial court that "[t]he objectionable materials have been removed." The State renewed its motion to admit the report, the trial court asked defense counsel if she had any objection, and she replied no. *Id.* at 283–84, 833 S.E.2d at 48–49. The Court in *Betts* ultimately held that the invited error doctrine applied to the defendant's argument that the trial court erred in admitting the report. *Id.* at 284, 833 S.E.2d at 49. The Court reasoned, "Defendant's counsel not only failed to renew Defendant's objection to the admission of the . . . [r]eport, but she

14

affirmatively and explicitly represented that she had no objection to the admission of the . . . [r]eport after the State had made the requested redactions."

*Betts* is distinguishable for various reasons. In *Betts*, defense counsel specifically—and affirmatively—indicated that she would not object to the admission of the report if the State redacted the objectionable portions. Defense counsel actively participated in the process of making the report non-objectionable by reviewing the State's redacted version of it, approving of the new version, and then telling the trial court she had no objection to the admission of the redacted version. In the present case, however, the Prosecutor indicated he would seek to admit the "cumulus cell phone records" and "SMS texts . . . between the parties" and explained that he had "spoken with" defense counsel about "this." This does not indicate that the parties entered into a stipulation on the matter. The trial court specifically responded that it could allow identical copies of the exhibits to be published to each juror "without a stipulation" if they were admitted first. The extent of defense counsel's involvement in the matter occurred when he stated, "I think that's probably a pretty good idea. I might want to use the same method in cross-examination or with [Defendant's expert witness] Mr. Green when the time comes."

Therefore, *Betts* is distinguishable because the involvement of defense counsel in ensuring the report was redacted far exceeds any purported "involvement" of defense counsel in this case in causing Exhibits 174 and 175 to be admitted and published to each juror individually. Indeed, the Record does not reveal that defense

counsel had any such involvement, nor that he in any other way affirmatively caused the error he now argues constitutes plain error. We cannot conclude defense counsel's statement, "I think that's probably a pretty good idea" constitutes an affirmative non-objection like defense counsel's action in *Betts*; much less an affirmative action directly precipitating the alleged error. *Miller*, 289 N.C. App. at 433, 889 S.E.2d at 234. Rule of Appellate Procedure 10(a)(4) specifically allows for plain error review upon a defense counsel's failure to object.

Likewise, defense counsel's statement that he "might want to use the same method in cross-examination or with [Defendant's expert witness] Mr. Green when the time comes" does not amount to invited error. The fact defense counsel was contemplating whether he "might want to use the same method" the trial court had just ruled the prosecutor could use is not an affirmative action inviting or joining in the error. As discussed *supra*, our Supreme Court has held that the invited error doctrine applies where a defendant's affirmative actions directly precipitating the error are "unequivocal." *Roseboro*, 344 N.C. at 372–73, 474 S.E.2d at 318. There, the defense counsel's statement of "Yes, sir, it is. Yes, sir" was held as an invited error, to which the defendant could not seek relief due to his own actions. Here, counsel's statement that he "*might* use the same method" is insufficient to demonstrate "unequivocal" actions precipitating the alleged error. The word "might" does not meet

the threshold articulated by the Court in *Roseboro*.[2]

Therefore, we must now determine whether defense counsel elicited testimony upon cross-examination which Defendant now challenges on appeal. We hold he did not. It is well settled that defense counsel invites error when he elicits testimony on cross-examination and then challenges the same testimony on appeal. *State v. Wingard*, 317 N.C. 590, 599, 346 S.E.2d 638, 644 (1986). In *Wingard*, our Supreme Court held that the defendant waived his challenge to certain testimony on appeal where the State elicited the testimony from a witness, and "defense counsel, on cross-examination, elicited the same testimony." *Id*.

The State points to trial transcript pages 1,778–1,836 of defense counsel's cross-examination of Detective Sibbett regarding certain portions of Defendant's and Caleb's text message exchanges. Much of defense counsel's cross-examination focused on demonstrating that Defendant was not the only one who initiated communications with Caleb. Indeed, for a significant portion of this cross-examination exchange, defense counsel questioned Detective Sibbett regarding State's Exhibit 179, the Verizon report of Defendant's phone call log. Defense counsel sought to highlight to the jury that

although the text messages might make it look like this

---

[2] The Merriam-Webster Dictionary defines "unequivocal" as "leaving no doubt;" "expressing only one meaning;" "lending to only one conclusion;" "clear, unambiguous;" "not open to challenge." *See Unequivocal, Webster's Third New International Dictionary* (3rd ed. 2002). By contrast, "might" is defined as "be in some degree likely to." *See May, Webster's Third New International Dictionary* (3rd ed. 2002).

> was a one-way thing, that [Defendant] was the one who was texting [Caleb] and that she was the one who was interested in having conversations, if we look at the record, the phone records as well, we can see that he was also interested in contacting her because he called her several times?

Detective Sibbett replied, "Yes, sir. There's conversation both ways." Defense counsel further sought to highlight Caleb's volatility as displayed by his "profane diatribe[s]," his tendency to go "from zero to red in five seconds," and his threatening texts to Defendant. Defense counsel did not address the numerous irrelevant and prejudicial texts nor the enlarged graphic images that Defendant now challenges on appeal. Thus, defense counsel's cross-examination did not trigger the invited error doctrine.

Finally, defense counsel did not trigger the invited error doctrine by requesting another extraction of data from Defendant's phone. It came to light during trial that the Randolph County Sheriff's Office "did not make a mirror image of the contents of [Defendant's] phone, as could have been done at the time the . . . download was accomplished." The Sheriff's Office did not download audio files, specifically, short, recorded audio messages that may be sent instead of text messages. Defense counsel was not aware prior to trial there were audio texts that the State did not collect from Defendant's phone. For that reason, he requested a further extraction from Defendant's phone:

> [S]ince I do have an expert who can be here tomorrow, I would ask that -- that the phone be available to him for an extraction. I think that's what they call it. I've been calling it a cell phone dump, but I think it's an extraction. . . . But

now that we know -- now that we know for sure that -- well, I don't think that we know for sure there's something on there, but we know there's a possibility there's something on there and that a decision was made not to include that in -- in the selected items. I think it's incumbent on me to ask for that.

The trial court ordered that Defendant's cellphone be subject to a further download. With this second extraction performed, the State sought to admit the extraction into evidence as State's Exhibit 214. Defense counsel acknowledged that the Prosecutor had given him the extraction, but defense counsel had not had a chance to examine it because he was "trying to pay attention to [the Prosecutor's direct examination of] Detective Sibbett to prepare for the cross-examination." Defense counsel explained his position on the admission of the second extraction:

> I am not going to object to the extraction and I'll go ahead and put on the record my reason for that.
>
> First of all, I didn't object. It's already in evidence as the State -- as Mr. Sherriff said, State moved to admit the extraction, itself. So it's in evidence. It's in evidence because I asked the Court to order an extraction to be performed yesterday. So for better or for worse I'm the one who caused this extraction and this new evidence to come forward.
>
> I don't think I'm in a position to object to it. I'm not inclined to object to it. There are things in there that I will be using I expect.

Defense counsel's request of the second extraction does not demonstrate that he sought to introduce all of the contents of Defendant's phone to the jury or to publish unredacted texts or enlarged, graphic images to the jury. Rather, it was an act of due

19

diligence in seeking to uncover potentially exculpatory evidence. On appeal, Defendant does not challenge State's Exhibit 214, the extraction containing the audio texts. Defendant's request of the second extraction does not trigger the invited error doctrine nor otherwise support its application.

Accordingly, we hold the invited error doctrine does not apply under the facts of this case. We will review the challenged State's Exhibits 174 and 175 for plain error.

Plain error refers to fundamental error. *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983). A trial court commits plain error "where it can be fairly said the instructional mistake had a probable impact on the jury's finding that the defendant was guilty." *Id.* (quotation marks and citations omitted). "To show that an error was fundamental, a defendant must establish prejudice—that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty." *State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (quotation marks and citations omitted).

Our Supreme Court recently elaborated that the prejudice standard, which requires a "showing that a jury *probably would have* reached a different result[,]" means that the standard "requires a showing that the outcome is *significantly more likely than not.*" *State v. Reber*, 386 N.C. 153, 159–60, 900 S.E.2d 781, 787–88 (2024) (second emphasis added) (holding that the prosecutor's cross-examination of the defendant was not plain error where there was "plenty of surrounding evidence that

supported [the sole eyewitness'] credibility."). The Court in *Reber* explained, "the analysis is whether, without that evidence, the jury probably would have reached a *different* result." *Id.* at 160, 900 S.E.2d at 788 (emphasis in original). Stated slightly differently, "the question on plain error is" whether, absent the challenged evidence, "the jury probably would have returned a *different* verdict." *Id.* at 162, 900 S.E.2d at 789 (emphasis in original). To make this determination, this Court must "examine[] the state of all the evidence except for the challenged evidence and ask[] whether, in light of that remaining evidence, the jury probably would have done something different." *Id.* The Court further explained, "a close case is not enough to prevail on the prejudice prong of plain error." *Id.*

## B. Exhibits 174 and 175

Defendant argues the trial court plainly erred when it allowed Exhibit 174 to be admitted into evidence and in allowing the text messages contained in the exhibit to be published to and held by the jury. Specifically, Defendant argues many of the text messages were irrelevant to the determination of her guilt and highly prejudicial to her. We agree.

Generally, "[a]ll relevant evidence is admissible," and "[e]vidence which is not relevant is not admissible." N.C. Gen. Stat. § 8C-1, Rule 402 (2023). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2023). Even

21

if evidence is otherwise relevant, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, . . . or needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403 (2023). "Unfair prejudice has been defined as an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Mason*, 315 N.C. 724, 731, 340 S.E.2d 430, 435 (1986) (quotation marks omitted).

Evidence that is not pertinent to the guilt of the accused may be unduly prejudicial and should be excluded. *See State v. Lopez*, 188 N.C. App. 553, 557, 655 S.E.2d 895, 898 (2008) (trial court properly excluded testimony of two witnesses where their testimony did not point to the guilty of anyone other than the defendant and was "not inconsistent with the guilt of Defendant"); *see also State v. Cuevas*, 121 N.C. App. 553, 556–58, 468 S.E.2d 425, 427–28 (1996) (the trial court erred in admitting the defendant's passport indicating he recently visited Colombia because of the country's "widely known" association with the drug trade, and ownership of a passport showing travel to Colombia was "not probative of a fact at issue" in the defendant's trial for trafficking cocaine); *Browning v. Carolina Power & Light Co.*, 114 N.C. App. 229, 232–33, 441 S.E.2d 607, 609–10 (1994) (trial court prejudicially erred in admitting an officer's testimony that he discovered two bottles of liquor in the driver's purse because the officer also testified "he had no reason to believe that alcohol consumption contributed to the accident"); *Sheppard v. Sheppard*, 38 N.C.

App. 712, 713–14, 248 S.E.2d 871, 873 (1978) (in a custody proceeding by natural mother against deceased husband's family, trial court properly excluded letter written by the deceased husband asking the mother not to prosecute an assault charge against him where the character of the husband was "not in issue"). In sum, our Supreme Court has held that it may be prejudicial error for a trial court to admit evidence that does not have "probative value" but rather has "potential only for inflaming the jurors." *State v. Hennis*, 323 N.C. 279, 286, 372 S.E.2d 523, 528 (1988).

A trial court errs when it admits highly inflammatory evidence that is not relevant to the question of a defendant's guilt. In *State v. Temples*, this Court addressed the admissibility of a letter, allegedly written by a defendant, which referenced contemplating suicide and her purported "experiences with drugs, abortion, and incest." *State v. Temples*, 74 N.C. App. 106, 108, 327 S.E.2d 266, 267 (1985). The defendant in *Temples* was convicted of second-degree murder of her husband with whom she had a "tumultuous" marriage. *Id.* at 107, 327 S.E.2d at 267. Defendant was inside her bathroom, holding a pistol and contemplating suicide when her husband opened the bathroom door and told her, "You put that gun up to your god damn head and I'll help you pull it, I'll help you pull that trigger, you just hold it up there and I'll put my hand on it and pull it. *Id.* Defendant testified she believed her husband intended to kill her, so she shot him three times. The evidence at trial tended to show the fatal bullet was fired from a distance of more than two feet. The trial court admitted the letter along with an instruction to the jury that it could be

considered only for impeachment purposes. *Id.* at 108, 327 S.E.2d at 267. This Court reasoned that the "the State's argument as to [the letter's] relevance for impeachment purposes [was] totally unpersuasive" and that "in addition to [the letter's] collateral nature, . . . the contents of this document are inflammatory, with the potential prejudicial impact under the circumstances far outweighing any conceivable probative value of this evidence." *Id.* at 108, 327 S.E.2d at 268. The Court ordered a new trial due to the trial court's cumulative errors. *Id.* at 110, 327 S.E.2d at 268.

The manner in which an exhibit is presented to the jury also may constitute error. In *State v. Hennis*, the defendant was convicted of three counts of first-degree murder. *Hennis*, 323 N.C. at 279, 372 S.E.2d at 523. The trial court admitted thirty-five photographs of the crime scene and autopsies. *Id.* at 282, 372 S.E.2d at 525. The State presented the photographs to the jury by erecting "an unusually large screen on a wall directly over [the] defendant's head such that the jury would continually have him in its vision as it viewed the slides." *Id.* at 286, 372 S.E.2d at 528. Our Supreme Court concluded this "was a manner of presentation that in itself quite probably enhanced the prejudicial impact of the slides themselves." *Id.* The Court further reasoned, "the thirty-five duplicative photographs published to the jury one at a time just before the state rested its case were excessive in both their redundancy and in the slow, silent manner of their presentation." *Id.* The Court in *Hennis* held that admitting the redundant, "grotesque and macabre" photographs constituted prejudicial error where the evidence of the defendant's guilt was not overwhelming.

24

*Id.* at 286–87, 372 S.E.2d at 528.

Here, the trial court admitted State's Exhibits 174 and 175 into evidence without objection. State's Exhibit 174 contained a download of text messages from Defendant's phone dated 5 March 2017 through 16 June 2017. The trial court did not give the jury any limiting instruction regarding how the jury was to consider such "evidence." The trial court allowed the prosecutor to publish to each member of the jury "a duplicate copy of [State's Exhibits] 174 and 175."

Exhibit 174 contained numerous irrelevant and prejudicial text messages. The prosecutor had Detective Sibbett read large portions of Defendant's text exchanges having no relevance at all to the alleged crime of second-degree murder. Examples include Defendant asking April and Caleb if they had seen her new Facebook profile picture; Defendant's son asking Defendant if he could get his physical; details of Defendant's and Caleb's relationship such as her telling him that he was "the best thing that ever happened to" her, they needed "[c]lear communication" and "whole truths" in order to stay "on track" in their relationship, "True love is so hard to find, and they say once you find it you [lose] your mind," and "I'm sorry that I keep hurting you and your family"; Defendant telling her son where she was sitting for April's graduation; and incoming texts telling Defendant about concerns regarding April's mental health.

These texts were irrelevant to the jury's determination of whether Defendant committed second-degree murder and prejudicial because they could only serve to

cause "confusion of the issues" in the minds of the jurors and constituted "needless presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403. The text messages had the probable impact of causing confusion by shifting the focus of the case from the question of whether Defendant acted in self-defense to whether she was someone of whom the jurors should approve personally. The only conceivable purpose for the State to admit texts providing every intimate detail of Defendant's relationship with Caleb, as displayed through their text messages, was to demonstrate the tumultuous nature of their relationship. The jury would have heard plenty of such evidence. Defendant testified that: she began having an affair with Caleb and continued it after learning that he was married; she carried on affairs with three different men simultaneously; even though Defendant protested at first, she eventually consumed methamphetamine at Caleb's urging because he believed it would improve their sex; at Caleb's suggestion, Defendant performed oral sex on Caleb's supplier to pay for their methamphetamine; and Defendant's drug use made him angry and volatile toward Defendant. Clearly, providing printed handouts of the text messages so that the jurors could "follow along" while Detective Sibbett read them aloud from the witness stand posed a "danger of . . . needless presentation of cumulative evidence" and substantially outweighed the texts' probative value because the jury would have been aware of the tumultuous nature of Defendant's and Caleb's relationship even without them. N.C. Gen. Stat. § 8C-1, Rule 403.

We further note that these largely irrelevant text exchanges were unfairly

prejudicial to Defendant because of their likelihood to turn the jurors against her based on their personal distaste for her lifestyle. *See* N.C. Gen. Stat. § 8C-1, Rule 403 ("evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]"). Defendant's and other witnesses' testimony demonstrating numerous sordid details about Defendant's life does not excuse the texts being published to the jury nor allowing them to retain the texts for the duration of trial. This is because the text messages likely would have made Defendant even more contemptible in the jury's mind than she already would have been due to the other testimony presented at trial. The texts constituted additional confusing, needlessly cumulative, and unfairly prejudicial evidence regarding Defendant's life, serving only to inflame the jurors' emotions and causing them to convict her based on their distaste of Defendant rather than the relevant facts and law.

Moreover, the State published text message exchanges to the jury that were grossly prejudicial and carried a high propensity to inflame the emotional reaction of the jurors. State's Exhibit 174 contained a text exchange between Defendant and her mother regarding how someone they knew was stabbed with an eight-inch steak knife, and Defendant's mother stated, "[t]hat crazy bitch stab[bed] him in the back of the neck"; text messages from Defendant describing Caleb as "the main one" and "the married one" among the other individuals with whom Defendant was having an affair; texts discussing the propriety of Defendant having an intimate relationship with a married man; a text exchange between Defendant and her son in which

27

Defendant's son told her that he was pulled over for a traffic stop and that the police officer was "an old guy so he'll probably be a dick head," and Defendant responded, "Well he's [in] the wrong"; and another text exchange between Defendant and her son in which her son explained he was going to get in trouble because he skipped school to be with a girl, and Defendant asked him, "Was your dick in you[r] pants or in her mouth" and told him he should have lied about where he was; a text exchange from Defendant to another woman in which Defendant asked the woman if she wanted to see a "picture of [Defendant] in restraints"; a text exchange from Defendant to a woman in which Defendant asked, "guess who's coming over to play with me in an hour," and the woman suggested that Defendant use candles and hot wax; and a text message from a previous sexual partner in which he told Defendant, "Next time when you get ready to call be ready to suck dick."

These text messages were inflammatory and unduly prejudicial because they probably caused the jurors to convict Defendant based on their emotional revulsion toward her rather than acquit her based on the evidence of self-defense. *Mason*, 315 N.C. at 731, 340 S.E.2d at 435; *Lopez*, 188 N.C. App. at 557, 655 S.E.2d at 898. Defendant's mother's comment regarding a "crazy bitch" stabbing someone in the back of the neck portrays Defendant's family as callous toward one being seriously injured. Defendant's text stating that an officer was in the wrong for pulling over her son portrays Defendant as antagonistic toward law enforcement officers. Defendant's text regarding her son's possible sexual activity and encouraging him to lie to school

28

authorities about why he was absent in class depicts her as exercising poor parenting choices, encouraging dishonest and sexually questionable behavior to her minor son, being disrespectful toward authority figures, and being morally unprincipled. Defendant's text messages regarding her sex life further depict her as sexually profligate and having a cavalier attitude about having affairs.[3]  It is not difficult to foresee that such inflammatory information would lodge at the forefront of the jurors' minds when deciding whether to convict Defendant.

Moreover, although testimony from Defendant herself as well as others already demonstrated she lived a morally questionable personal life, these texts constitute additional, irrelevant information that the jurors were allowed to hold indefinitely after publication to the jury, further adding to their unduly prejudicial effect. *Hennis*, 323 N.C. at 286–87, 372 S.E.2d at 528.

We conclude the introduction of State's Exhibit 174 had a probable impact on the outcome of the trial by needlessly making the jurors more disgusted with her, whereas the jury probably would have acquitted her without such inflammatory and prejudicial texts when considering all the other evidence presented. *Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334.

The State compares the admission of the texts contained in Exhibit 174 to the admission of an officer's testimony in *State v. Peterson*.  205 N.C. App. 668, 695 S.E.2d

---

[3] We note this does not reflect the opinion of this Court. Rather, we explain the likely prejudicial effect the texts created in the minds of the jurors.

29

835 (2010). In *Peterson*, the defendant shot his live-in girlfriend and was convicted of assault with a deadly weapon inflicting serious injury. *Id.* at 668–69, 695 S.E.2d at 837. On appeal, the defendant argued the trial court erred in allowing an officer to testify the defendant told him that a week prior to the shooting, he had told a friend that he could have sexual intercourse with his girlfriend and that his girlfriend had caught him cheating on her. *Id.* at 674, 695 S.E.2d at 840. Specifically, the defendant argued the officer's testimony was irrelevant and unfairly prejudicial pursuant to Rule 403 of the North Carolina Rules of Evidence. *Id.* at 673, 675, 695 S.E.2d at 840–41. This Court held that "[e]vidence of what precipitated the argument" between the defendant and his girlfriend and "what the argument was about is part of the account of the assault" and was "necessary to complete the story of that assault for the jury." *Id.* at 674, 695 S.E.2d at 840–41. This Court further held that while the officer's testimony "certainly cast[] defendant in a negative light," it was "supportive of defendant's claim of self defense" because it showed that the girlfriend had reason "to be very angry with defendant." *Id.* at 675, 695 S.E.2d at 841.

The State argues Exhibit 174 was relevant because it contained texts between Defendant and Doug, which were relevant to Caleb's drug use, and therefore relevant to Defendant's self-defense theory because Caleb's drug use was known to make him act aggressively. However, *Peterson* is distinguishable from the case *sub judice*. In *Peterson*, the officer's testimony was directly relevant to why the girlfriend started the physical fight, as the defendant testified. *Id.* at 670, 695 S.E.2d at 838. Here,

however, Defendant testified at trial regarding Caleb's drug use, and the jury was aware that Defendant called Dana to inform her of his drug use and that she was concerned for her safety around Caleb. An expert witness also testified that using methamphetamine can cause one to become aggressive. Therefore, the jury already was aware that the amphetamine and methamphetamine found in Caleb's system after the shooting potentially caused him to become aggressive at the time of the shooting. Moreover, even if the texts regarding Caleb's drug use had some relevance to his possible state of mind at the time of the shooting, they had no bearing on *why* he broke into Defendant's home or what he intended to do while there. Most importantly, and as explained *supra*, the texts in Exhibit 174 revealed far more than Caleb's drug use and had no relevance whatsoever to either Defendant's or Caleb's state of mind or whether Defendant acted in self-defense. Rather, they revealed weeks' worth of Defendant's personal conversations, and many of them served only to confuse the jury, needlessly present cumulative evidence, and unfairly prejudice Defendant. N.C. Gen. Stat. § 8C-1, Rule 403; *see also Lopez*, 188 N.C. App. at 557, 655 S.E.2d at 898; *Cuevas*, 121 N.C. App. at 556–58, 468 S.E.2d at 427–28; *Browning*, 114 N.C. App. at 232–33, 441 S.E.2d at 609–10; *Sheppard*, 38 N.C. App. at 713–14, 248 S.E.2d at 873 (a trial court should exclude evidence not pertinent to the defendant's guilt and that serves to unfairly prejudice the defendant).

Likewise, the trial court's admission of Exhibit 175 into evidence and the like manner in which it was published to each member of the jury posed the same issues

pertaining to confusion of the issues, presentation of cumulative evidence, and unfair prejudice.  N.C. Gen. Stat. § 8C-1, Rule 403.

State's Exhibit 175 is a "phone examination preview report for" multimedia messages, meaning communications other than written text messages; in other words, photographs taken from Defendant's cell phone.  Exhibit 175 contained at least four photographs of Defendant and Caleb kissing, while appearing to be unclothed, a very close-up "resized" image of a vagina, a very close-up "resized" image of anal sex sent by Defendant to Caleb, a very close-up "resized" image of vaginal sex sent by Defendant to Caleb, and a very close-up "resized" image of oral sex showing Defendant's face also sent by Defendant to Caleb.  These images, published to each individual juror, were "enlarged" in that they were printed on "8x10" pieces of paper, occupying most of the space on the page.  The images appeared much larger than they would have on a cell phone, a fraction of the size of a normal sheet of paper, or in a normally sized photograph.  The Prosecutor referred specifically to these graphic images, asking Detective Sibbett to identify the type of sexual activity taking place in each photograph.

Admitting these photos into evidence and publishing a copy for each juror to keep throughout the trial raises many of the issues mentioned in Rule 403. Presenting the images to the jury and focusing on them in the State's direct examination of Detective Sibbett confused the issues because the jury essentially was asked to determine whether Defendant was a good or bad person rather than whether

she acted in self-defense when she shot Caleb. The images constituted needless presentation of cumulative evidence because the jury already would have been aware of the licentious nature of Defendant's personal life from other witnesses at trial, including from Defendant herself. The testimonial evidence made crystal clear Defendant entertained simultaneous affairs with multiple men. Further, there is nothing that perhaps one photo of oral, anal, *or* vaginal sex could not have accomplished that submitting *all three* types of photos to the jury purportedly accomplished. In other words, the State needlessly presented cumulative evidence that Defendant and Caleb engaged in sexual activity, although the jury already was aware that they engaged in sexual activity from other testimony presented at trial. Moreover, it does not follow that the images were indeed relevant to the question of the overall "intensity" of Defendant's and Caleb's relationship. Some people have "intense"—perhaps emotionally tumultuous—relationships without having sex, while others engage in all manners of sexual activity without any emotional attachment. The photos had little, if any, probative value on the question of how Defendant and Caleb felt about each other or treated each other outside of their sexual relationship.

We conclude the admission of the photos meets the high threshold for plain error because, but for their admission, the jury probably would have acquitted Defendant. It is one matter for Defendant to testify that she had affairs with and/or engaged in sexual activity with multiple men. It is another matter entirely for the

jurors each to be given a packet visually—and viscerally—depicting Defendant engaging in such activity and to have one of the State's witnesses identify the type of sexual activity involved.[4]    Unless the jurors were accustomed to looking at pornography, the close-up images of Defendant engaging in sexual activity with a married man only served the purpose of shocking and disgusting the jury.    *See Hennis*, 323 N.C. at 286, 372 S.E.2d at 528 ("Given this absence of additional probative value, these photographs—grotesque and macabre in and of themselves— had potential only for inflaming the jurors."); *see also Lopez*, 188 N.C. App. at 557, 655 S.E.2d at 898; *Cuevas*, 121 N.C. App. at 556–58, 468 S.E.2d at 427–28; *Browning*, 114 N.C. App. at 232–33, 441 S.E.2d at 609–10; *Sheppard*, 38 N.C. App. at 713–14, 248 S.E.2d at 873 (evidence that is not pertinent to the defendant's guilt and is unfairly prejudicial to the defendant should be excluded).    The admission of the photographs into evidence and their publication to each member of the jury to hold for the duration of the trial, without a limiting instruction, probably had the effect of convincing the jury that Defendant was morally reckless and sexually profligate.  She

---

[4] Photos may illustrate testimony in a manner that is more shocking and inflammatory than mere testimony.  Photos of victims' bodies is one example.  Our Supreme Court stated in Hennis, "this Court has repeatedly warned against the redundant or excessive use of photographs of victims' bodies." 323 N.C. at 284, 372 S.E.2d at 527.  In other words, trial courts must be particularly aware of the number of and manner in which graphic photos are presented to the jury.  The court in Hennis noted that even where prejudicial photos are relevant and competent, and are therefore otherwise admissible, "the admission of an excessive number of photographs depicting substantially the same scene may be sufficient ground for a new trial when the additional photographs add nothing in the way of probative value but tend solely to inflame the jurors." *Id.* at 284–85, 372 S.E.2d at 527 (citations omitted).

would have appeared careless regarding the impact that having an affair with a married man might have on Defendant's family. The jurors only needed to open up the photocopied exhibit and view the photos contained within it to be reminded that Defendant callously engaged in various manners of sexual activity with a married man. Therefore, Exhibit 175 plainly fails the Rule 403 balancing test in that the photos were not pertinent to the question of second-degree murder or self-defense *and* encouraged the jury to base its decision on an improper basis of emotion. *Mason*, 315 N.C. at 731, 340 S.E.2d at 435; *Lopez*, 188 N.C. App. at 557, 655 S.E.2d at 898. We hold the admission of Exhibit 175 into evidence and its publication to each member of the jury probably impacted the jury's deliberation and conviction of Defendant, and but for the error, the jury would have reached a different result. *Lawrence*, 365 N.C. at 518, 723 S.E.2d at 334.

The State argues the photographs are comparable to those which this Court held were properly admitted in *State v. Shannon.* 182 N.C. App. 350, 642 S.E.2d 516 (2007). In *Shannon*, the defendant was convicted of first-degree murder and conspiracy to commit first-degree murder of her husband. *Id.* at 351, 642 S.E.2d at 518. On appeal, the defendant argued "the trial court erred by admitting three sexually suggestive photographs of" her. *Id.* at 354, 642 S.E.2d at 520. The defendant specifically argued "the photographs were irrelevant and, alternatively, unduly prejudicial." *Id.* The defendant and her deceased husband were members of a "swingers" club, and the defendant invited a man named "Wilson" to be a member of

the club. *Id.* at 351, 642 S.E.2d at 519. The three photos portrayed the defendant engaging in sexual activity with Wilson, among others. *Id.* at 355, 642 S.E.2d at 521. First, this Court held the photos were relevant because they "helped support the State's contention that defendant wanted to be with Wilson and that this constituted a motive to kill Shannon," and because they "illustrated the chain of events leading up to Shannon's murder, and corroborated the existence of Wilson's sexual relationship with defendant." *Id.* Second, this Court held "the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice." *Id.* at 356, 642 S.E.2d at 521. This Court reasoned the trial court admitted only three out of the eight photos the State sought to introduce "and directed that the photographs would be passed around to the jurors in a folder and not shown on an overhead projector." *Id.*

*Shannon* is distinguishable from the case *sub judice*. First, the link of relevance between the photos and the shooting is much more tenuous in this case than in *Shannon*. In *Shannon*, the defendant "told Wilson she loved him and could see herself being with him." *Id.* at 352, 642 S.E.2d at 519 (quotation marks omitted). She then instructed her daughter to shoot the deceased in his sleep. *Id.* at 353, 642 S.E.2d at 519–20. Here, there is no evidence demonstrating Defendant planned to kill Caleb. Therefore, the photographs in this case are not relevant to a conspiracy to shoot Caleb due to romantic jealousy or anger. Second, unlike the trial court in *Shannon* admitting only three out of eight photos, here, the trial court did not admit

selected photos. Rather, the trial court admitted the entirety of Exhibit 175, unredacted, including photos portraying Defendant engaging in various manners of sexual activity with Caleb. Third, the trial court in this case did not have the photos put into a folder and passed among the jurors. Rather, the trial court allowed an identical copy of Exhibit 175 to be published to and retained by each juror. Therefore, the manner of publication in this case is unfairly prejudicial because the jurors presumably could open the packet of photos throughout the trial to view the inflammatory photographic evidence of Defendant's sexual activities.

The admission of Exhibits 174 and 175 and allowing the jurors to hold the texts for the duration of trial are comparable to trial courts' errors in *Temples* and *Hennis*. The Court in *Temples* held the trial court's admission of the letter detailing the defendant's experiences with drugs, abortion, and incest was irrelevant, inflammatory, and prejudicial. Here, as in *Temples*, the question for the jury was not whether Defendant was a good or bad person, but rather whether Defendant committed second-degree murder or acted in self-defense. Like the letter in *Temples*, the texts in Exhibit 174 contained information about Defendant's personal life that would have disgusted a jury and caused them to vote based on passion, whereas absent the evidence, the jury probably would have acquitted Defendant. The same is true for Exhibit 175. Like the letter containing controversial information about the defendant in *Temples*, here, the photos were of a "collateral nature" and "inflammatory, with the potential prejudicial impact under the circumstances far

37

outweighing any conceivable probative value of this evidence." 74 N.C. App. at 108, 327 S.E.2d at 268.

Moreover, as in *Hennis*, the way the texts and photos were published to the jury "quite probably enhanced the prejudicial impact of the [texts] themselves." 323 N.C. at 286, 372 S.E.2d at 528. Neither the texts nor photos were redacted; the State did not select specific texts or only one photo to demonstrate the "tumultuous" nature of Defendant's and Caleb's relationship. Like the "the thirty-five duplicative photographs published to the jury one at a time just before the state rested its case [which] were excessive in both their redundancy and in the slow, silent manner of their presentation," here, the publication to the jurors of numerous, highly sensitive photos and over three weeks' worth of texts between Defendant and Caleb and allowing them to hold copies of the texts for the duration of trial was redundant, excessive, and highly prejudicial. *Id.* Comparable to the graphic photos shown on a projector behind Defendant's head in *Hennis*, the photos portraying sexual activity in Exhibit 175 were far larger than they would appear on a cell phone.

As a final note, our conclusion that the trial court plainly erred in admitting Exhibits 174 and 175 is further supported by a review of *Sheffield*, where this Court held the alleged error did not reach the level of plain error. *State v. Sheffield*, 282 N.C. App. 667, 872 S.E.2d 122 (2022). In that case, the defendant was convicted of first-degree sex offense with a child after he forced the child victim to watch pornography and then sexually assaulted him. At trial, the State admitted three

photographs into evidence without objection, including: one photograph depicting a dresser drawer containing a condom and two dildos; and two photographs depicting a Ziploc bag of condoms, one of which showed a dildo in the background. On appeal, the defendant argued the trial court plainly erred in admitting the photos, as "these items were unrelated to the alleged offense and found in a separate room." *Id.* at 671, 872 S.E.2d at 126. This Court held that the photographs were erroneously admitted; however, because of the absence of an objection, the error did not rise to the level of plain error.

*Sheffield* is distinguishable from the present case, specifically, in two dispositive ways. First, the defendant in *Sheffield* argued that the trial court barred the State from introducing evidence about the defendant's sexuality, and the admitted photographs carried implications pertaining to defendant's sexuality. This Court disagreed with the defendant's argument, as unchallenged evidence was previously introduced at the trial regarding the defendant's sexuality, so "the implication would have been before the jury regardless of any error." *Id.* at 677, 872 S.E.2d at 130. The same cannot be held here. In Exhibit 174, the implication that Defendant lived a morally questionable personal life was before the jury regardless of any error. However, the personal conversations in the text messages had implications that *would not* have otherwise been before the jury: that Defendant's family was callous toward one being seriously injured; Defendant was antagonistic toward law enforcement officers; Defendant exercised poor parenting choices,

encouraged dishonest and sexually questionable behavior to her minor son; and she was sexually profligate and had a cavalier attitude about affairs. Unlike *Sheffield*, these prejudicial implications exposed the jury to irrelevant information that was not previously introduced.

Second, the defendant in *Sheffield* argued "the erroneous admission of a photograph with dildos in the background suggested Defendant was immoral and/or a sexual deviant more likely to sexually assault a child." *Id.* at 677, 872 S.E.2d at 130. In response, this Court noted that the photographs were only referenced in the presence of the jury when the State laid the foundation and when the defendant commented on the photographs during closing arguments. There, this Court held "[t]he evidence properly introduced at trial and the evidence that is not the subject of this appeal *is sufficiently strong* that the improperly admitted evidence, *in light of its minimal emphasis*, did not have a probable impact on the jury." *Id.* at 678, 872 S.E.2d at 130 (emphasis added). Thus, because of the overwhelming evidence of guilt, and the lack of emphasis on the improperly admitted evidence, the error did not rise to plain error.

By contrast, here, it cannot be held that the evidence was "sufficiently strong" nor that the State only placed a "minimal emphasis" on the improperly admitted evidence. First, we have acknowledged the discrepancies in Defendant's accounts of the shooting; however, she consistently stated in *four* accounts: "Mr. Adams arrived angry, came into the house, and then came into her bedroom to obtain her phone.

When she refused to give him her phone, Mr. Adams grabbed her gun from the nightstand, which was in its holster." *Hicks*, 385 N.C. at 56, 891 S.E.2d at 239. Although her accounts differed from that point, there was substantial evidence presented at trial demonstrating that she acted in self-defense. Therefore, the evidence was not "sufficiently strong" as in *Sheffield*.

Second, it can hardly be concluded that the State placed only a "minimal emphasis" on Exhibits 174 or 175. Exhibit 174 was admitted without a limiting instruction; each member of the jury was provided printed handouts of the text messages; the text messages were read aloud, while the jury followed along on the handout; and the jurors kept the evidence for the remainder of the trial. Likewise, Exhibit 175 was published to each individual juror; the photographs were enlarged and unredacted so that the picture occupied most the space on the page; the State specifically referred to the photographs and identified the type of sexual activity taking place; and the jurors retained the packet of photographs for the remainder of the trial. For these reasons, the present case is easily distinguishable from *Sheffield*, where the evidence was only referenced while laying the foundation and during closing arguments. Considering how the evidence was presented to the jury, how it was published to the jury, and the manner in which it was discussed during the witnesses' testimony, we cannot conclude that the State placed a minimal emphasis on Exhibits 174 and 175. Thus, the evidence properly introduced at trial was *not* sufficiently strong and the State's emphasis on the improperly admitted evidence had

a probable impact on the jury.

## C. The State of All the Evidence

We reach this holding—that, absent the admission of Exhibits 174 and 175, the jury probably would have acquitted Defendant—after examining the state of all the evidence absent the challenged evidence. *Reber*, 386 N.C. at 159, 900 S.E.2d at 787. April was home for the duration of the altercation and testified that Defendant burst into the home. She testified that she heard *Caleb tell Defendant he was going to kill her*, and she could hear a physical struggle. Despite the seeming discrepancies in Defendant's various accounts of the shooting, the evidence tended to show that Caleb burst into Defendant's home, after Defendant texted him not to come to her home, and told her he was going to kill her. In all of Defendant's accounts, she stated that Defendant initiated physical contact with her. She told the two deputies that it was Caleb who grabbed her while he was holding the gun, he dropped it, and she picked it up and shot him. She told the detectives that after she refused to hand over her phone, a wrestling match ensued (presumably, Defendant did not initiate physical contact with an armed man who wanted to take her phone), the gun and phone switched hands, and she shot him. At trial, she testified that Caleb pointed the gun at her, and although she threw her phone at him, Caleb was the one who physically grabbed her and stomped on her feet, prohibiting her from walking past him, and when she tried to break free, Caleb pinned her arm. Defendant then shot Caleb.

We note especially that even though the physical evidence tends to show Caleb was shot in the back from more than six inches away, possibly indicating that he was leaving Defendant's room, April was in the home during the encounter. Therefore, even if Caleb turned around to leave Defendant's room, she had no way of knowing whether Caleb intended to harm April. We further note that Caleb recreationally consumed methamphetamine, Defendant told Dana she was concerned for her safety after Caleb threatened her, and an expert witness testified at trial that methamphetamine can cause heightened aggression. Therefore, Defendant reasonably would have believed that Caleb burst into her home and intended to cause her serious bodily harm.

We conclude there was substantial and persuasive evidence presented at trial demonstrating Defendant acted in self-defense. Therefore, absent the admission of Exhibits 174 and 175 into evidence, it is significantly more likely the jury would have acquitted rather than convicted her. *Reber*, 386 N.C. at 159, 900 S.E.2d at 787. As explained *supra*, the highly inflammatory and prejudicial information presented in the exhibits that were held by the jurors throughout the trial probably caused them to ignore the substantial evidence of self-defense. The jurors probably would have acquitted Defendant if the exhibits did not cause them to reach their decision based on passion, namely, a personal revulsion toward Defendant.

We do not reach our holding because of a conclusion that this was a "close case." *Reber*, 386 N.C. at 162, 900 S.E.2d at 788–89. Rather, we hold that, absent the

character assassination of Defendant through the admission into evidence of Exhibits 174 and 175, the jury probably would have reached a different result due to the substantial and persuasive evidence demonstrating she acted in self-defense.

## III.    Conclusion

For the foregoing reasons, we hold the trial court plainly erred in admitting into evidence voluminous, unredacted text messages and photos without a limiting instruction and in publishing identical copies and enlarged sexually explicit photos to each member of the jury.  Accordingly, we vacate the judgment entered against Defendant and remand for a new trial.  It is so ordered.

VACATE AND REMAND FOR NEW TRIAL.

Judge FLOOD concurs.

Judge MURPHY dissents by separate opinion.

MURPHY, Judge, dissenting.

I agree with the Majority that the trial court erred in admitting Exhibits 174 and 175. However, when disregarding the challenged evidence from Exhibits 174 and 175, the conflicting evidence would make this a "close case" for the jury, which our Supreme Court unequivocally removed from the realm of plain error in *Reber*. *See State v. Reber*, 386 N.C. at 162. Instead, *Reber* clarified that in conducting plain error analysis we "examine[] whether absent the error, the jury *probably would have* returned a different verdict." *Id*. at 159. Furthermore, our Supreme Court went on to hold:

> This wording is important because this standard—showing that a jury *probably would have* reached a different result—requires a showing that the outcome is significantly more likely than not. In ordinary English usage, an event will "probably" occur if it is "almost certainly" the expected outcome; it is treated as synonymous with words such as "presumably" and "doubtless."

*Id.*

Here, I cannot conclude that a jury probably, almost certainly, presumably, or doubtlessly would have reached a different result if Exhibits 174 and 175 were properly excluded. Defendant gave inconsistent accounts of the events leading up to Caleb's shooting death, and the evidence indicated that Caleb was shot twice in the back from more than six inches away. Furthermore, the Majority recognizes that the jury heard "plenty" of evidence demonstrating the tumultuous nature of Defendant's

relationship with Caleb, *Majority* at 26, and "testimony demonstrating numerous sordid details about Defendant's life[.]" *Majority* at 27. Although the trial court erroneously admitted "needlessly cumulative[] and unfairly prejudicial evidence regarding Defendant's life," *Majority* at 27, when "disregarding the challenged evidence, this was a fairly close case for the jury[.]" *Reber*, 386 N.C. at 162. Here, as discussed in *Reber*, the Majority focuses "on the highly prejudicial impact of the challenged evidence" and, recognizing the admission of unchallenged evidence that demonstrated the sordid details of Defendant's life, effectively shows how the erroneously admitted evidence merely "made it more likely that the jury would convict[.]" *Id.* (cleaned up). Based on the contradictory evidence, in the absence of the erroneously admitted Exhibits 174 and 175, I would characterize this as a "close case" for the jury; I cannot say that, "disregarding the challenged evidence," *id.*, the jury "almost certainly" would have accepted Defendant's claim of self-defense. *Id.* at 159. For these reasons, under *Reber*'s recently articulated plain error standard, I respectfully dissent.